**Suzanne BAKER, Administratrix of the Estate of Albert J. Baker, and Wife of Albert J. Baker, Appellants,**

v.

**AC&S, INC., et al., Appellee.**

**Suzanne Baker, Administratrix of Estate of Albert J. Baker, and Wife of Albert J. Baker, Appellees.**

v.

**AC&S, Inc., et al., Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1998.
Filed March 30, 1999

---

R. Bruce McElhone, Philadelphia, for Baker.

Robert W. Rowan, Philadelphia, for AC&S, Inc.

Martin Greitzer, Philadelphia, for Greitzer and Locks, amicus curiae.

Anne E. Cohen, New York City, for Podesta and Cohen, amicus curiae.

Before McEWEN, President Judge, and CAVANAUGH, DEL SOLE, KELLY, EAKIN, JOYCE, STEVENS, SCHILLER and LALLY–GREEN, JJ.

SCHILLER, J.:

¶ 1 This case involves consolidated appeals from judgments against AC&S, Inc. entered in favor of Suzanne Baker, as administratrix of the estate of her deceased husband and in her own right. Mrs. Baker appeals from these judgments, alleging that the trial court erred in molding the verdict. AC&S cross-appeals from these judgments, alleging that there was insufficient evidence to establish its liability.

For the reasons set forth below, we reverse in part, affirm in part and remand for further proceedings.

FACTS:

¶ 2 Albert J. Baker and his wife, Suzanne, filed a civil action under theories of strict liability and negligence against several manufacturers and/or sellers of asbestos-containing products, seeking damages resulting from Mr. Baker's exposure to asbestos and Mrs. Baker's loss of consortium. The Bakers' first complaint, filed on January 17, 1989, alleged that Mr. Baker had pleural plaques on his lungs; pursuant to this Court's holding in *Giffear v. Johns–Manville Corp.*, 429 Pa.Super. 327, 632 A.2d 880 (1993) (*en banc*),[1] the Bakers' case was dismissed without prejudice in January, 1994. However, Mr. Baker later developed diffuse malignant mesothelioma and, with leave of court, the Bakers amended their complaint and reactivated their case on March 31, 1995. The trial was reverse-bifurcated, as are all asbestos actions in Philadelphia County. The damages phase was tried before the Honorable Charles Mirarchi, Jr. and a jury; on June 2, 1995, the jury awarded $2 million to Mr. Baker for his injuries and $200,000 to Mrs. Baker for loss of consortium.[2] Several defendants were dismissed from the case on motions for summary judgment; in addition, the Bakers settled with Owens–Corning Fiberglas Corporation, Pfizer, Inc., Asbestos Claims Management Corporation ("ACMC") (formerly National Gypsum), and the Manville Personal Injury Settlement Trust ("the Manville Trust") pursuant to joint tortfeasor releases.[3] The liability phase was tried before the Honor-

---

1. In *Giffear v. Johns–Manville Corp.*, 429 Pa.Super. 327, 632 A.2d 880 (1993) (*en banc*), *aff'd sub nom. Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996), this Court held that pleural thickening, unaccompanied by manifest symptoms, impairment, or disability was not a cognizable claim in Pennsylvania.

2. Mr. Baker died of mesothelioma on September 26, 1995, and Suzanne Baker was thereafter substituted as a party for Mr. Baker.

3. The Manville Trust release was a *pro tanto* release, providing for a set-off, or reduction in the verdict, on account of the Trust's share in the amount of the consideration paid under the release ($30,000). The other three tortfeasors received *pro rata* releases, providing for a set-off on account of their respective shares in the amount of their allocated shares of the liability.

able Victor J. DiNubile, Jr., sitting without a jury, on September 16 and 17, 1996. The only defendant present at the liability phase was AC&S, an insulation contracting company, against whom Mrs. Baker proceeded on a strict liability theory. Based on the evidence presented, the trial court found AC&S, Owens–Corning, Pfizer, ACMC, and the Manville Trust jointly liable for the Bakers' injuries.

¶ 3 The trial court molded the verdict to reflect the shares of the settling joint tortfeasors. In doing so, the trial court disregarded the terms of the Bakers' releases with respect to these tortfeasors. Instead, the trial court interpreted applicable state law, consistent with the terms of the Manville Trust settlement, to require that damages among strictly liable defendants be apportioned on a "pro rata" basis, with each defendant paying no more than its "pro rata" share.[4] Accordingly, AC&S was required to pay only one-fifth of the total damages awarded to Mrs. Baker, or a total of $440,000. The trial court denied both parties' post-trial motions and entered judgment in the amount of $400,000 plus $17,386.30 in delay damages in favor of Mr. Baker's estate and $40,000 in favor of Mrs. Baker for loss of consortium.[5] These timely cross-appeals followed.

DISCUSSION:

I. *The Baker Appeal*

▮▮▮▮ ¶ 4 Mrs. Baker presents an issue of first impression: whether in the context of a strict liability action, pursuant to the provisions of the Uniform Contribution Among Tortfeasors Act ("UCATA"),[6] and applicable case law, a *pro tanto* release executed by the plaintiffs in favor of the Manville Trust should be enforced according to its express terms to reduce the plaintiffs' recovery against the non-settling tortfeasor.[7] From this issue we discern a more fundamental question: whether under the unique circumstances of this case the plaintiffs or the non-settling tortfeasor should bear the burden of the shortfall between the consideration paid by the Manville Trust ($30,000) and its allocated share of the damages awarded to the plaintiff ($440,000), a difference of $410,000. Mrs. Baker argues that AC&S should pay this shortfall. Specifically, Appellant argues that the trial court erred in not enforcing the *pro tanto* release because it misinterpreted certain provisions of the Manville Trust Disposition Process ("TDP") and case law concerning allocation of liability and enforcement of releases. AC&S responds that AC&S should not be required to pay this shortfall because the provisions of the TDP and applicable state law *require* a *pro rata* set-off in a Pennsylvania strict liability asbestos action regardless of the terms of the release.[8]

### *The Manville Trust and the TDP*

¶ 5 We begin our discussion by reviewing the historical background of the Manville Trust and the TDP.[9] In 1988, the Manville Trust was created to pay all health claims brought against the Johns–

---

4. The trial court used the phrase "pro rata" to mean divided equally among the liable tortfeasors.

5. The trial court properly declined to award delay damages on Mrs. Baker's loss of consortium claim. *Anchorstar v. Mack Truck*, 533 Pa. 177, 620 A.2d 1120 (1993).

6. Act of July 9, 1976, P.L. 586, No. 142, effective June 27, 1978, 42 Pa.C.S. §§ 8321 *et seq.*

7. Since Appellant executed *pro rata* releases with the three other settling tortfeasors, the reduction in verdict on account of their allocated shares of the liability is not at issue.

8. In reviewing a non-jury verdict, we must determine whether the findings of the trial court are supported by the evidence and whether the trial court committed error in any application of law. *Castetter v. Mr. "B" Storage*, 699 A.2d 1268 (Pa.Super.1997). Moreover, the trial court's conclusions of law are not binding on the appellate courts, whose duty it is to determine whether there was proper application of the law to the facts by the trial court. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 535 Pa. 469, 636 A.2d 156 (1994).

9. This historical background is gleaned from the federal district courts' opinion approving the terms of the settlement. *See* n. 10, *infra*.

Manville Corporation ("Manville") as a result of asbestos exposure. Beneficiaries of the Trust included present and future health claimants as well as other manufacturers of asbestos products with claims against Manville for contribution. It was estimated that approximately 83,000—100,000 claims would be filed against the Trust. However, because significantly more claims were filed (240,000 by December, 1994), and the value of the claims was higher than expected, the Trust became insolvent. In November, 1990, a class action began to restructure the Trust, and a proposed settlement agreement was reached. However, this settlement was challenged by some health claimants and co-defendants, and the matter was remanded for further proceedings.

¶ 6 Following remand, the court approved the designation of six subclasses consisting of present and future beneficiaries of the Trust, and a stipulation of settlement was approved on January 19, 1995.[10] By that time, the Trust's liabilities were in excess of $6.7 billion, and the projected liability was estimated to be between $21 and $25 billion; the Trust assets, however, were no more than $2.5 billion. Without restructuring the Trust, it would not be able to pay equitable compensation to any of the Trust beneficiaries. The ultimate goal of the settlement was for all of the claimants to share equally in the burdens imposed by the Trust's limited fund status. The parties adopted a Trust Distribution Process ("TDP") to accomplish that goal by paying all claimants—whether asbestos health claimants, co-defendants or distributors—over time an equivalent share of their claims' values, and by reducing significantly the Trust's operating and litigation expenses in order to maximize the assets available to the Trust beneficiaries.

¶ 7 The parties agree that they are bound by the terms of the Manville Trust settlement and the TDP, and that the TDP applies to actions, such as the case *sub judice*, where the liability verdict was rendered after February 18, 1995. The TDP is relevant in this case because Appellee is seeking a reduction in the verdict to reflect the involvement of the Manville Trust as a responsible party. Pursuant to the Manville Trust settlement, the rights of the parties in that regard are governed by the provisions of the TDP. We therefore turn our analysis to a review of the applicable terms of the TDP.

¶ 8 Under Section H of the TDP, the beneficiaries agreed to dismiss all pending claims against the Trust. The TDP established a schedule ("matrix") of asbestos-related disease categories and values; a health claimant can obtain the scheduled value for a claim or can seek an individual claim valuation.[11] The TDP further provided that the Trust will pay a percentage of this value on a current basis.[12] Mr. Baker's claim for mesothelioma was rated in the highest category of scheduled values; pursuant to his settlement with the Trust, the liquidated value of his claim was $300,000, and he was paid $30,000, or 10% of that value.

¶ 9 The TDP also governs the rights of the health claimant and co-defendant asbestos manufacturers and distributors following a health claimant's settlement with the Trust, changing state law in some respects. First, a co-defendant has no right of contribution against the Trust, except in limited circumstances not applicable here.[13] Second, in exchange for relin-

---

10. *In re Joint Eastern & Southern Districts Asbestos Litigation*, 878 F.Supp. 473 (E. & S.D.N.Y.1995), *aff'd in part, rev'd in part*, 78 F.3d 764 (2d Cir.1996), *on remand*, 929 F.Supp. 1 (E. & S.D.N.Y.1996), *aff'd without op.*, 100 F.3d 944 (2d Cir.1996) *and* 100 F.3d 945 (2d Cir.1996) (hereinafter *"Findley"*). The stipulation of settlement and the Trust Distribution Process ("TDP") are annexed to that opinion.

11. TDP, Section B.

12. TDP, Section G.1. Currently, the percentage is 10%; this percentage may be adjusted in the future. *Findley, supra,* at 494.

13. The TDP permits contribution claims by co-defendants against the Trust only where the underlying claim *has not been liquidated,* or where the trial court has not permitted a

quishing its right to implead the Trust in any litigation with the health claimant, the co-defendant has the right to ask the court to treat the Trust as a "legally responsible tortfeasor" without the introduction of further proof.[14] Third, if the health claimant obtains a verdict against the co-defendant, the co-defendant can obtain a "set-off" or reduction in verdict in respect to the Trust whether or not the claimant's direct claim against the Trust has been resolved.[15] The set-off is measured by reference to applicable local law.[16]

¶ 10 Section H of the TDP creates five categories of states: (1) *pro tanto,* (2) *pro rata,* (3) allocation or apportionment, (4) several liability, and (5) multiple set-off rules. TDP, § H.3 (b), (c), (d), (e), and (f).[17] The TDP does not expressly categorize Pennsylvania, or any other state. Indeed, the federal district courts specifically stated that the rights and duties of the parties under Section H of the TDP would be decided by the state courts interpreting the TDP in accordance with local law. *In re Joint Eastern & Southern Districts Asbestos Litigation,* 878 F.Supp. 473, 546 (E. & S.D.N.Y.1995). Accordingly, in order to determine the appropriate category into which Pennsylvania falls under the TDP, it is necessary for us to review the applicable law. Following an extensive review of the law of contribution and set-off in Pennsylvania, we conclude that Pennsylvania fits most properly in category H.3(f), a state with "multiple set-off rules."

### Contribution and Set-off in Pennsylvania

¶ 11 Under Pennsylvania law, it is well-established that if the tortious conduct of two or more persons combines to cause a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently. *Kovalesky v. Giant Rug Market,* 422 Pa.Super. 116, 618 A.2d 1044 (1993); *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d 1249 (1984). Joint tortfeasors are, by definition, jointly and severally liable to the plaintiff for his or her injuries. 42 Pa.C.S. § 8322. Imposition of joint and several liability enables the injured party to satisfy an entire judgment against any one tortfeasor, even if the wrongdoing of that tortfeasor contributed only a small part of the harm inflicted. *Glomb v. Glomb,* 366 Pa.Super. 206, 530 A.2d 1362 (1987) (*en banc*), *appeal denied,* 517 Pa. 623, 538 A.2d 876 (1988). Thus,

set-off claim. TDP, Section H.3(d)(ii)(B), H.4(a). However, the Trust states that set-off, or verdict reduction, is clearly preferred over contribution for purposes of satisfying co-defendant claims against the Trust. TDP, Section H.2.

14. TDP, Section H.1(d), H.2(a).

15. TDP, Section H.1 (c), H.2.

16. TDP, Section H.3.

17. Section H.3 of the TDP provides, in relevant part, as follows:

(b) *Pro tanto states. Pro tanto* states are those in which any judgment against a nonsettling defendant is reduced by the amount paid or agreed to be paid by a released party....

(c) *Pro rata states.* In *pro rata* states, total liability is divided equally among all defendants found by the fact finder to be legally responsible tortfeasors (or agreed by the parties to be legally responsible tortfeasors, if applicable law so provides), including released parties. In such states, judgments against nonsettling defendants are reduced, as provided by applicable law, by either the *pro rata* share attributable to released parties or the amount paid or agreed to be paid by released parties....

(d) *Allocation or apportionment states.* Allocation or apportionment states provide that the amount of any judgment shall be reduced with reference to the apportioned share of released or absent parties....

(e) *Several liability states.* Where the applicable state or other law provides for *several* liability (as distinguished from joint and several liability) for all or part of a cause of action,....

(f) *States with multiple set-off rules.* In some states, different set-off rules (*pro tanto, pro rata* or apportionment), govern different causes of action or parts thereof or different elements of damages....

TDP, § H.3.

if the court imposes joint and several liability, and if only one of the joint tort-feasors is financially responsible, the injured party can attempt to recover the full measure of damages against that single source. The financially responsible tort-feasor who satisfies more than his or her equitable share of the joint liability then bears the risk of recovering the excess from his or her less responsible fellow tort-feasors.

*Id.* 530 A.2d at 1365 (citations omitted).

¶ 12 At common law, the release of any tortfeasor released all other tortfeasors in the case, regardless of the parties' intent. *Hilbert v. Roth*, 395 Pa. 270, 149 A.2d 648 (1959); *Anstine v. Pennsylvania Railroad Co.*, 352 Pa. 547, 43 A.2d 109 (1945); *Thompson v. Fox*, 326 Pa. 209, 192 A. 107 (1937). Moreover, there was no right of contribution between joint tortfeasors. *Oakdale Borough v. Gamble*, 201 Pa. 289, 50 A. 971 (1902); *Turton v. Powelton Electric Co.*, 185 Pa. 406, 39 A. 1053 (1898). Thus, "[e]ven if two parties were equally responsible for the plaintiff's injury, one could be held liable for the entire loss while the other went scot free." *Mattia v. Sears, Roebuck & Co.*, 366 Pa.Super. 504, 531 A.2d 789, 791 (1987), *appeal denied*, 519 Pa. 660, 546 A.2d 622 (1988). The Uniform Contribution Among Tortfeasors Act, ("UCATA"), 42 Pa.C.S. §§ 8321 *et seq.*, corrected these inequities. UCATA enables the plaintiff to settle with one tortfeasor and still have recourse against the remaining tortfeasors. UCATA also provides for contribution among joint tortfeasors, subject to the limitations set forth in the Act.

¶ 13 Section 8326 states that the effect of a partial settlement on the damages recoverable against the non-settling defendant is as follows:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S. § 8326. The release by the plaintiff does not relieve the settling tortfeasor from making contribution to another tortfeasor unless the release is given before the right of the other tortfeasor to secure monetary contribution has accrued and it provides for a reduction to the extent of the settling tortfeasor's *pro rata* share of damages recoverable against all other tortfeasors. 42 Pa.C.S. § 8327. Further, a tortfeasor is not entitled to contribution from another tortfeasor until he or she has discharged the common liability or paid more than his or her *pro rata* share thereof; however, a settling tortfeasor may seek contribution only from a tortfeasor whose liability he or she has extinguished. 42 Pa.C.S. § 8324.

¶ 14 In Pennsylvania, it is well-settled that the effect of the release is to be determined by the ordinary meaning of its language. *Wolbach v. Fay*, 488 Pa. 239, 412 A.2d 487 (1980); *Hasselrode v. Gnagey*, 404 Pa. 549, 172 A.2d 764 (1961). Thus, a party who signs a general release waiving all claims and discharging all parties will be precluded from thereafter suing a party who did not contribute consideration toward the release. *Buttermore v. Aliquippa Hospital*, 522 Pa. 325, 561 A.2d 733 (1989). However, if a plaintiff wants to settle with one joint tortfeasor but preserve the right to sue others, he or she can sign a *pro tanto* or a *pro rata* release. If the plaintiff settles pursuant to a *pro tanto* release, the plaintiff reduces his or her recovery against a non-settling joint tortfeasor by the amount of consideration paid for the release. *Wirth v. Miller*, 398 Pa.Super. 244, 580 A.2d 1154 (1990), *appeal granted*, 527 Pa. 637, 592 A.2d 1304 (1991), *appeal dismissed as improvidently granted*, 534 Pa. 278, 632 A.2d 309 (1993). By contrast, if a plaintiff settles pursuant to a *pro rata* release, the plaintiff reduces his or her recovery against the non-settling joint tortfeasor by that tortfeasor's allocated share of the total liability.

*Charles v. Giant Eagle*, 513 Pa. 474, 522 A.2d 1 (1987). Therefore, except in limited circumstances discussed *infra*, the parties to a release have the *option* to determine the amount or proportion by which the total verdict shall be reduced against the non-settling tortfeasors to reflect the settling tortfeasor's share.[18]

¶ 15 The amount or proportion of the set-off under a *pro rata* release also depends upon the underlying cause of action. In Pennsylvania, liability among joint tortfeasors is allocated differently in a negligence action than it is in a strict liability action. In a negligence action, liability is allocated among responsible tortfeasors according to percentages of comparative fault. Pennsylvania Comparative Negligence Act, 42 Pa.C.S. § 7102 (1982). Thus, a "pro rata" set-off is calculated based on the settling party's percentage of negligence as determined by the factfinder. *Charles v. Giant Eagle, supra.* However, in strict liability cases, as in the case *sub judice*, liability is allocated equally among responsible tortfeasors, without regard to fault. *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992). Thus, a "pro rata" set-off is calculated based upon the total liability divided by the number of defendants.[19]

## Categorizing Pennsylvania under the TDP

¶ 16 A review of the law in Pennsylvania concerning set-off and contribution demonstrates that Pennsylvania does not fall among the majority of jurisdictions in which the judgment is *automatically* reduced by the amount of consideration paid or the amount set forth in the release; nor does Pennsylvania follow the apportioned share rule, by which the plaintiff's judgment is reduced by the released tortfeasor's share as determined by the trier of fact, regardless of the terms of the release.[20] Further, Pennsylvania does not meet the definition of a "pro rata" state under the TDP [21] because liability is allocated differently depending on the underlying cause of action. Pennsylvania provides for joint and several liability, in addition to "several" liability,[22] among tortfeasors and, thus, does not meet the definition of a "several liability" state. Instead, since the amount of set-off depends both on the terms of the settling tortfeasor's release and the underlying cause of action, Pennsylvania fits most appropriately in category H.3(f), "States with multiple set-off rules." [23] Under this

18. The economics of litigation have been discussed in many scholarly journals; Pennsylvania, to its credit, has not locked into one form of set-off rules over another because the courts of this state have recognized that a multitude of factors go into a decision regarding settlement. *See Settlements Under Joint and Several Liability*, Kornhauser & Revesz, 68 N.Y.U. L.Rev. 427 (1993) (concluding that neither the *pro tanto* nor the apportioned share set-off rule consistently performs better than the other and that the relative settlement-inducing value of set-off rules depends upon the nature of the strategic interaction between the parties, including the costs of litigation and the probabilities of success).

19. It has been suggested that the phrase "allocation of liability" is preferable to "apportionment of damages" when referring to percentages of liability among jointly liable defendants, since the concept of "apportionment among joint tortfeasors" is an inconsistency in terms. *Torts: Law and Advocacy*, McHugh & Litvin, § 18.1 at 207 (1996)

(citation omitted). We have adopted herein the preferred phraseology.

20. *See generally* Jean Macchiaroli Eggen, *Understanding State Contribution Laws and Their Effects on the Settlement of Mass Tort Actions*, 73 TEXAS L.REV. 1701, 1709–15 (1995).

21. *See* n. 17, *supra*.

22. See *Glomb v. Glomb*, 366 Pa.Super. 206, 530 A.2d 1362, 1365 (1987) (*en banc*), *appeal denied*, 517 Pa. 623, 538 A.2d 876 (1988), for a discussion concerning the circumstances under which "apportionment of separate liabilities," or several liability, may be imposed.

23. Even if we were to find that, for purposes of a strict liability action such as the case *sub judice*, Pennsylvania meets the definition of a "pro rata" state under the TDP, we would still conclude, as did the trial court, that our analysis under § H.3 (c) depends upon the appli-

provision, "applicable law shall govern which set-off rules apply to each cause of action or part thereof and each element of damages." TDP, § H.3(f). We therefore turn to applicable Pennsylvania law to determine the appropriate amount of set-off in strict liability cases.

### Applicable Law in Pennsylvania

¶ 17 Appellant argues that, under Pennsylvania law, the terms of release determine the appropriate amount of set-off within the context of a strict liability action. Consequently, set-off in this case should be the amount of consideration paid by the Trust to the Bakers pursuant to their *pro tanto* release. Appellee, on the other hand, urges us to adopt the position taken by the trial court and to disregard the terms of the release. Relying upon *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992), and *Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650 (1993), the trial court concluded that, in Pennsylvania, damages are *apportioned* among defendants who are held strictly liable, such that each defendant is liable for its "pro rata" share and no more, regardless of the terms of a joint tortfeasor release. We do not read *Walton* or *Ball* so broadly; neither case suggests that joint and several liability should be abolished in strict liability cases. Instead, *Walton* and *Ball* addressed the concept of *allocation of liability* among joint tortfea-

sors for purposes of set-off and contribution.

¶ 18 In *Walton*, Hughes, a helicopter manufacturer, and Avco, an engine manufacturer, were found jointly liable for the plaintiffs' deaths on strict liability theories.[24] On appeal, the Pennsylvania Supreme Court first recognized that Hughes had an independent duty to warn the plaintiffs of the design defect; having incurred concurrent primary liability for the plaintiffs' injuries, Hughes was precluded from seeking indemnification from Avco. *Walton, supra*, at 578–80, 610 A.2d at 459–60. The Court next addressed whether Avco, which had settled with the plaintiffs for amounts in excess of the total verdicts, was entitled to seek contribution from Hughes. Reasoning that Avco's settlement with the plaintiffs did not relieve Hughes of its duty to pay the plaintiffs its full proportionate share of the damage awards, and that Avco had not extinguished Hughes' liability by virtue of its settlement, the Court rejected Avco's request for contribution.[25] *Id.* at 582, 610 A.2d at 461. Finally, in allocating liability between joint tortfeasors, both strictly liable, the Court concluded that such allocation should not be made on the basis of "comparative fault", but rather divided equally between the parties,[26] and remand-

cable law of contribution and set-off in Pennsylvania. However, because the TDP does not allow for contribution claims against the Trust by a co-defendant except under circumstances not applicable here, the trial court's finding that giving effect to a *pro tanto* release in this case would require the Appellant to indemnify the Trust *against a contribution claim by Appellee*, thereby creating an inequitable result, is not supported by the record. Moreover, we do not accept Appellee's claim that a *pro tanto* release is "deemed" a *pro rata* release under the TDP, as such claim fails to account for § H.3 (c)(i) and (ii), which clearly permit set-off *either* in the amount of the Trust payment or the Trust's allocated share of liability, as provided by applicable law.

24. The jury found Avco, the engine manufacturer, liable for defective engine design, and Hughes, the helicopter manufacturer which

used the defective engine part, liable for failure to warn of the defective design. *Walton, supra*, at 573, 610 A.2d at 457.

25. Thus, the issue of Hughes' "proportionate share" of liability arose in the context of assessing the rights and obligations as between the joint tortfeasors, in a situation where the settling tortfeasor, Avco, had settled *for more than* the total amounts of the verdicts.

26. In so finding, the Court reiterated the well-established concept that strict liability is imposed without regard to fault: "In our attempts to place inevitable financial burdens on those best positioned to bear them, we have continually protected the injured plaintiffs and held manufacturers responsible for the products they have put into the stream of commerce." *Walton, supra*, at 583–84, 610 A.2d at 462.

ed to the trial court for further proceedings. *Id.* at 584, 610 A.2d at 462.

¶ 19 The *Ball* case was an action involving several defendant asbestos suppliers, some of whom were bankrupt, and others of whom had been dismissed on summary judgment or settled with the plaintiff. On appeal, a panel of this Court was asked, *inter alia*, to determine the sufficiency of evidence necessary to permit allocation of liability in the context of the non-settling defendants' cross-claims against these other individuals. Emphasizing that the case involved theories of both negligence *and* strict liability, the Court recognized that allocation of liability on the basis of causal fault was not prohibited by *Walton, supra*, as to those settled defendants with sufficient evidence of liability.[27] *Ball, supra*, 625 A.2d at 658. However, the Court found that allocated liability based on fault was precluded in this instance for lack of sufficient evidence. In such a case, the Court held that liability should be allocated on a *pro rata*, or equal percentage basis, among only the joint tortfeasors found liable for the plaintiff's injuries. *Id.* 625 A.2d at 658–59.

¶ 20 Thus, neither *Walton* nor *Ball* stand for the legal proposition offered by the trial court — that liability must be apportioned *separately* among tortfeasors found strictly liable.[28] Moreover, while the *Ball* Court gives passing reference to Justice Papadakos' concurring opinion in *Walton*,[29] which suggests that joint tortfeasors found strictly liable should be limited to paying their *pro rata* share for all pur-

poses,[30] this position was not espoused by the majority in *Walton*, nor has it been adopted by the Pennsylvania Supreme Court in any subsequent decisions. Indeed, such a position would eradicate the well-established principles of joint and several liability and contribution among tortfeasors under the UCATA, which continues to be the law of this Commonwealth. Instead, *Walton* and *Ball* support our holding in this case that liability must be allocated equally among strictly liable joint tortfeasors solely for purposes of applying the UCATA's set-off and contribution provisions.

¶ 21 Alternatively, Appellee argues that *Walton* requires a *pro rata* set-off of the settling tortfeasor's share, regardless of the terms of the release, in all strict liability cases. However, in both *Walton* and the case on which it relied, *Charles v. Giant Eagle, supra*, the question was the obligation of the non-settling tortfeasor where the settling tortfeasor had paid *in excess of* its share of allocated liability. In both cases, relying upon policies in favor of promoting settlements, and avoiding a windfall to the non-settling tortfeasor, the Court required the non-settling tortfeasor to pay its full share of allocated liability in spite of the fact that the total payments to the plaintiff exceeded the amount of the jury verdict. The Court reasoned that, " '[t]here is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive.' "[31]

---

27. The Court also held that the trial court properly refused allocation as to those entities which had not been sued, were bankrupt, or for which there was insufficient evidence of liability. *Ball, supra*, at 659–61.

28. Notably, in neither *Walton* or *Ball* was there discussion of "distinct harms" suffered by the plaintiffs or whether there was a reasonable basis for "determining the contribution of each cause" to the single harm, as required for apportionment of *separate liabilities* among tortfeasors. *Glomb, supra*. Indeed, our courts have been reluctant to impose separate liability among defendants in

personal injury cases because "[m]ost personal injuries are by their very nature incapable of division." *Capone v. Donovan*, 332 Pa.Super. 185, 480 A.2d 1249, 1251 (1984); *see also Martin v. Owens–Corning Fiberglas*, 515 Pa. 377, 528 A.2d 947 (1987).

29. *Ball, supra*, 625 A.2d at 658.

30. *Walton*, 530 Pa. at 584–85, 610 A.2d at 463 (Papadakos, J., concurring).

31. *Walton, supra*, at 581, 610 A.2d at 461 (quoting *Charles v. Giant Eagle*, 513 Pa. 474, 478, 522 A.2d 1, 3 (1987)).

¶ 22 Neither *Walton* nor *Giant Eagle* addressed the issue before this Court, which is the determination of set-off in a strict liability case where the settling defendant paid *less* than its allocated share of liability pursuant to a *pro tanto* release. Indeed, neither party has adduced any authority directly on point. In analyzing this issue, however, we are guided by the principles and holdings of *Walton* and *Giant Eagle*.

¶ 23 First, the Court in *Giant Eagle* specifically stated that its decision was consistent with the provisions of UCATA, as "properly interpreted." *Giant Eagle, supra*, at 481, 522 A.2d at 4. The Court stated that the proper interpretation of Section 8326 was that the parties to a release are afforded "an option to determine the amount or proportion by which the total claim shall be reduced provided that *the total claim* is greater than the consideration paid." *Id.* (emphasis added). In that case, the total claim exceeded the consideration paid; the Court therefore gave effect to the terms of the release providing for a reduction in the verdict by the settling defendant's *pro rata* share of allocated liability. *Id.* at 482, 522 A.2d at 5. In *Walton*, while the Court did not specifically address the terms of the parties' release,[32] the amount of consideration paid pursuant to the release was in excess of the total jury verdict; accordingly, under the logic of *Giant Eagle*, the terms of the release did not preclude recovery by the plaintiff against the remaining tortfeasor.

¶ 24 Applying the "proper interpretation" of Section 8326 to the case *sub judice*, the amount of consideration paid by the settling tortfeasor was not in excess of the total claim; therefore, the terms of the release providing for a *pro tanto* set-off should be enforced. This interpretation serves the policies emphasized in *Walton* and *Giant Eagle* in favor of encouraging settlements and of respecting their finality. This interpretation also furthers the policies reinforced in *Walton* and *Giant Eagle* that the plaintiff should be fully compensated for his injuries, and that a non-settling joint tortfeasor should not benefit from the windfall of a settling tortfeasor paying more than his or her share of allocated liability. By extension, a non-settling joint tortfeasor should not receive a windfall in the form of a release of its joint and several liability to the plaintiff simply because another joint tortfeasor settled for *less* than his or her allocated share of liability. To hold otherwise would be to eradicate the principles of joint and several liability, and effectively to repeal the provisions of the UCATA. Moreover, such a result would discourage settlement because plaintiffs would not have the option of negotiating a *pro tanto* release.[33]

¶ 25 This result is also consistent with the result in *Wirth v. Miller, supra*. In *Wirth*, a panel of this Court addressed the enforceability of a *pro tanto* release pursuant to which the settling tortfeasor paid less than his share of the allocated liability in the context of a negligence action. In that case, we rejected the argument that *Giant Eagle* judicially supplanted the statutory requirements of UCATA to provide for a reduction in the verdict by the settling tortfeasor's allocated share of liability in every case. This Court held that if the language of the *pro tanto* release were ignored, "the effect would be to convert the jury's apportionment of liability, for

---

**32.** In his concurring and dissenting opinion, Justice Zappala would have enforced the express terms of the release which provided for, *inter alia*, a reduction in the verdict by the greater of the amount of consideration paid for the release, or the settling defendant's *pro rata* share of the liability. *Walton, supra*, at 586, 610 A.2d at 463 (Zappala, J., concurring and dissenting).

**33.** Whether the parties choose a *pro tanto* or *pro rata* release depends on the economics of the situation; a plaintiff is more likely to settle with a *pro tanto* release because, in a case where the settling defendant is paying less than its percentage share, such a release assures that the plaintiff will recover the difference between the amount paid in the settlement and the verdict. *Torts: Law and Advocacy, supra*, at 195.

purposes of contribution, to one of apportionment of liability for all purposes thereby eliminating joint and several liability as prescribed by law." *Wirth, supra,* at 1158. Appellee has presented no better argument in favor of eliminating joint and several liability in the strict liability context. Indeed, the policy of shifting the financial burden to the defendants is equally as great, if not greater, in such cases.[34]

¶ 26 We note that, under the circumstances of this case, AC&S will not be able to seek recovery from the Trust for payments made in excess of AC&S' share of allocated liability pursuant to the terms of the TDP. However, AC&S was in the class of co-defendants which negotiated for and received valuable concessions in exchange for agreeing not to seek contribution from the Trust; these concessions included being able to treat the Trust as a joint tortfeasor without the introduction of further proof, and receiving a set-off for the Trust's share of liability. Moreover, in the event that the Trust increases the percentage of the liquidated value payment over time, AC&S will be entitled to receive any additional payments to the extent that it paid the Trust's share of the verdict.[35] Thus, we will hold AC&S to the bargain they negotiated even if, in hindsight, that bargain was unfavorable. *Walton, supra.*

¶ 27 We further note that AC&S could have avoided the possibility of a contribution obligation in this case by settling in advance with the plaintiffs, as did three of the settling defendants, with a *pro rata* release. However, AC&S chose to "roll the dice" and take its chances that the factfinder would not impose liability, or that such liability would be less than the amount for which it might have settled. Having rolled "snake eyes", AC&S cannot be heard to complain about its joint and several liability to the plaintiffs for the full amount of the verdict, obligating it to bear the shortfall created by the plaintiffs' settlement with the Trust.

¶ 28 In sum, we conclude that a *pro tanto* release given to a settling tortfeasor in a strict liability action must be enforced according to its terms, so long as the consideration paid for the release does not exceed the value of the plaintiff's total claim. Our decision is consistent with Pennsylvania's longstanding legislative intent and judicial affirmation that (1) as between the rights of victims and competing tortfeasors, the rights of victims shall be paramount, and (2) plaintiffs and defendants are free to choose the method of settling cases consistent with their respective interests and strategies. The Commonwealth's policy has always been that settlements shall be encouraged and parties need all incentives available to end litigation on an amicable basis. *Walton, supra*; *Giant Eagle, supra.* Accordingly, we conclude that the trial court erred as a matter of law in failing to give effect to the Manville Trust *pro tanto* release. We reverse the trial court's denial of Appellant's request to mold the verdict pursuant to this release, and we remand this case to the trial court for further proceedings consistent with this Opinion.

## II. *The AC&S Appeal*

¶ 29 We next address AC&S' claim that there was insufficient evidence of its liability to support the verdict. The standard concerning the sufficiency of evidence in asbestos-related personal injury actions is well-established:

> In order for a defendant to be liable in a products liability action, whether under a theory of negligence or strict lia-

---

34. *See, e.g., Svetz v. Land Tool Co.*, 355 Pa.Super. 230, 513 A.2d 403, 409 (1986), *appeal denied*, 515 Pa. 584, 527 A.2d 544 (1987), in which this Court stated, "Strict liability was based upon a policy determination that, as between an innocent consumer and a manufacturer of a defective product, the manufacturer should bear the loss."

35. Pursuant to TDP, H.3 (a)(iii), it is possible, though admittedly not likely given the financial state of the Trust, that AC&S will receive payment from the Trust to a maximum of $270,000 ($300,000 minus $30,000 already paid).

bility, [the] plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. In an asbestos action this requires that a plaintiff establish more than mere presence of asbestos in the workplace. Plaintiff must prove that he worked in the vicinity of the products' use and that, hence, he inhaled asbestos fibers shed by the product of a specific manufacturer.

*Ottavio v. Fibreboard*, 421 Pa.Super. 284, 287, 617 A.2d 1296, 1297–98 (1992) (*en banc*) (citations omitted). Moreover, in reviewing the sufficiency of evidence to support the verdict, we view the evidence in the light most favorable to the verdict winner, granting that party the benefit of all reasonable inferences. *Id.*

¶ 30 The trial court summarized the evidence at trial as follows:

> Both Mr. Baker at his deposition and a fellow worker, John McGrath, testified that Mr. Baker daily worked with persons installing Armstrong asbestos thermal pipe insulation in the course of the building's extensive renovation. AC&S vigorously contested that thermal pipe covering was used to insulate the heating system installed in the building. In support of its position, AC&S presented Joseph Laspina, the head of the Kardon Building's maintenance staff at the time, who testified there was no insulation whatsoever on the pipes in question. The court chose to reject this testimony, reasoning that it would have made little sense to leave the building's steam pipes uninsulated during the extensive renovation of the building. Instead, the court accepted the testimony of Mr. Baker and his co-worker, Mr. McGrath, who testified both that the steam pipes **were** insulated, and that this insulation was asbestos-containing Armstrong pipecovering. Consequently, there was sufficient evidence presented to support the court's finding that Mr. Baker was exposed to AC&S' product.

Trial Court Opinion, 1/16/97, at 3 (citation omitted).

¶ 31 It is well-established that questions of credibility and conflicts in evidence are for the trial court to resolve and a reviewing court should not reweigh the evidence. *Adamski v. Miller*, 545 Pa. 316, 319, 681 A.2d 171, 173 (1996). Moreover, the factual findings of the trial court will not be disturbed unless they are not supported by competent evidence in the record. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 535 Pa. 469, 636 A.2d 156 (1994). Absent an abuse of discretion, the trial court's determination will not be disturbed. *Id.*

¶ 32 After a thorough review of the record, including the deposition testimony of Mr. Baker, and the trial testimony of Mr. McGrath and Mr. Laspina, we conclude that the trial court's findings of fact are supported by competent evidence, with the exception of its finding that Mr. McGrath identified Armstrong as the manufacturer of the asbestos pipecovering. In fact, while Mr. McGrath corroborated Mr. Baker's testimony that he worked as a steamfitter in close proximity to workmen installing asbestos pipecovering on a regular basis for approximately two years and that this pipecovering created dust that Mr. Baker inhaled, N.T., 9/16/96, at 20–21, he was unable to recall any trade names on the boxes of pipecovering. *Id.* at 37. Nevertheless, Mr. Baker remembered Armstrong pipecovering at the site, which he identified as such because the boxes of pipecovering had a distinctive marking, "a big circle with an A in it ...". Baker Deposition, 4/6/95, at 64–65. Mrs. Baker also presented medical expert testimony by a board-certified pathologist and a board-certified pulmonologist that Mr. Baker's exposure to asbestos fibers during his employment as a steamfitter substantially contributed to his contracting mesothelioma, which is a cancer of the lining of the ribcage and outside of the lung commonly associated with asbestos exposure. N.T. 9/16/96 (p.m.), at 24; 9/17/96, at 10–11, 16–17.

¶ 33 On the basis of this testimony, taken in the light most favorable to the plaintiff as verdict winner, the evidence established that Mr. Baker worked in the vicinity of an Armstrong asbestos product and that he inhaled the asbestos fibers shed by this product. We therefore conclude that the evidence was sufficient to support the trial court's finding that Armstrong's asbestos products were a substantial factor in causing Mr. Baker's injuries, *Ottavio, supra*, and that AC&S was liable as a joint tortfeasor for these injuries.[36] Accordingly, we affirm the trial court's order denying AC&S' motion for judgment notwithstanding the verdict.

CONCLUSION:

¶ 34 For the foregoing reasons, we reverse in part and affirm in part the Order of the Court of Common Pleas of Philadelphia County dated January 16, 1997, and remand this case to that court for further proceedings consistent with this Opinion.

¶ 35 DEL SOLE, J., joins and files a Concurring Statement

¶ 36 LALLY–GREEN, J., files a Concurring Statement

¶ 37 EAKIN, J., files a Dissenting Opinion, joined by McEWEN, President Judge, and JOYCE, J.

DEL SOLE, J., concurring:

¶ 1 I join the majority's analysis and disposition. I agree Pennsylvania recognizes multiple set-off rules. Unlike the dissent, I believe the parties to a release are free to contract how set-offs will be treated. I cannot agree with the dissent that the express agreement of the parties to the contract should be judicially modified simply because of the nature of the underlying claim.

LALLY–GREEN, J., concurring:

¶ 1 The Majority states the issue as: "whether under the unique circumstances of this case the plaintiffs or the non-settling tortfeasor should bear the burden of the shortfall between the consideration paid by the Manville Trust ($30,000) and its allocated share of the damages awarded to the plaintiff ($440,000), a difference of $410,000." (Majority Opinion at page 1144.) I believe the issue is: what is the effect of the parties' release in the context of the Manville Trust Disposition Process ("TDP")?

¶ 2 All of the parties here agreed to the terms of the TDP. Thus, the TDP governs the resolution of this issue. The Majority details the provisions of the TDP and concludes that Pennsylvania is a TDP, paragraph H.3(f) state, *i.e.*, a state with "multiple set-off rules." Paragraph H.3(f) provides as follows:

In some states, different set-off rules (*pro tanto, pro rata* or apportionment), govern different causes of action or parts thereof or different elements of damages. In such states, applicable law shall govern which set-off rules apply to each cause of action or part thereof and each element of damages.

I agree with the Majority's conclusion.

¶ 3 Paragraph H.3(f) of the TDP provides that applicable state law shall govern which set-off rules apply to each cause of action and each element of damages. Here, the cause of action is strict liability. There appears to be no statutory authority governing set-offs in a strict liability context.[37] Relevant, but not controlling, case

---

36. AC&S, formerly Armstrong Contracting and Supply Co., took over the insulation installation business of Armstrong Cork Co., and obtained the right to use the "Armstrong" trade name on thermal insulation products by a licensing agreement executed in 1957. As Mr. Baker's exposure to asbestos in this case took place between 1969 and 1971, when he worked at the Kardon Building, the evidence supported the trial court's finding that the asbestos pipecovering in the Armstrong boxes was sold or supplied by AC&S.

37. The Majority argues that the Uniform Contribution Among Joint Tortfeasors Act, 42 Pa. C.S. § 8321 *et seq.* ("UCATA") provides guidance here. While UCATA is applicable to negligence cases, it does not apply in strict liability cases. *See Ball*, 625 A.2d at 658, quoted in Dissenting Opinion by Eakin, J., at 1158.

law is found in *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992). There, the Supreme Court held that each strict liability co-defendant has equal responsibility for the judgment and a settling strict liability co-defendant can not seek contribution for overpayment of a judgment from other co-defendants. *Id.*, 530 Pa. at 581, 610 A.2d at 461. *See also, Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650, 658 (1993). Neither *Walton* nor *Ball* addressed the issue of whether a strict liability co-defendant can be held responsible for another strictly liable co-defendant's inability to pay its share to an undercompensated plaintiff.[38] Consequently, since this is not the issue before us to resolve,[39] we are left with no state statutory authority or case law controlling set-offs in this case.

¶ 4 Thus, we turn to the terms of the release to determine what happens here. Since the release is pro tanto, plaintiff has a contractual right to seek relief from the other strict liability defendants. Thus, I concur in the result.

EAKIN, J., dissenting:

¶ 1 The majority holds the trial court erred as a matter of law in failing to give effect to the Manville Personal Injury Settlement Trust's *pro tanto* release. I respectfully dissent, and would affirm the trial court's order molding the verdict.

¶ 2 The issue before this Court is the effect of plaintiff's settlement with one tortfeasor, the Trust, on the remaining non-settling tortfeasor, AC&S; in dollars and cents terms, the issue is whether AC&S should bear the $410,000 shortfall between the consideration paid by the Trust and its allocated share of damages.

¶ 3 The majority gives the release *pro tanto* effect (according to its terms), holding AC&S must make up the $410,000 shortfall. The majority determines Pennsylvania is a state with multiple set-off rules for purposes of the Trust Distribution Process (TDP), looking broadly at the law of set-off and contribution and determining both *pro tanto* and *pro rata* releases are authorized in Pennsylvania, depending on the nature of the underlying action.[40] I would look directly at strict liability actions, since this case proceeded on a strict liability basis. In such cases, the *pro rata* approach is preferable because, as discussed fully below, it reflects the reality of the Trust's limited fund status, gives effect to the terms of the TDP, and follows the guidance of cases most relevant to this issue.

¶ 4 Massive asbestos litigation spawned this issue, which essentially pits its unique complexity against fundamentals of Pennsylvania law on set-off and contribution. The Trust evolved from the bankruptcy proceedings of Johns–Manville Corpora-

38. The dissent argues logically that since strict liability co-defendants can not seek contribution for overpayment from other co-defendants, then, under state law, absent its agreement to the contrary, a strict liability co-defendant can not be held responsible for another strictly liable co-defendant's inability to pay its share. It is suggested that the public policy controlling *Walton* and *Ball* might be different from the public policy in effect in a case like this one where a plaintiff has been underpaid.

39. This issue is not directly before us as a case or controversy as a similar issue was in *Walton* and *Ball*.

40. There are difficulties inherent in either approach. If we accept Pennsylvania is a state with multiple set-off rules for purposes of the TDP, Section H.3(f) of that document (the multiple set-off provision) directs us to "applicable law [which] shall govern which set-off rules apply to each cause of action." This language brings us back to *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992) and *Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650 (1993)(*see* discussion, *infra* ), which hold joint tortfeasors in a strict liability case are liable only for their *pro rata* share. If Pennsylvania is a *pro rata* state for strict liability purposes, TDP § H.3(c) (*the pro-rata* provision) provides in *pro-rata* states "judgments against nonsettling defendants are reduced, as provided by applicable law, by either the *pro rata* share attributable to released parties *or by the amount paid ... "* (emphasis added), bringing us to Section 8326, *see infra* at 1157, of the Uniform Contribution Among Tortfeasors Act.

tion, a manufacturer and distributor of asbestos products. *See In re Joint Eastern and Southern Districts Asbestos Litigation (Findley v. Falise)*, 878 F.Supp. 473 (E. & S.D.N.Y.1995), *aff'd in part, rev'd in part*, 78 F.3d 764 (2d Cir.1996), *on remand*, 929 F.Supp. 1 (E. & S.D.N.Y.), *aff'd*, 100 F.3d 944 (2d Cir.1996). The Trust succeeded to Manville's extensive asbestos liabilities and recognized injured plaintiffs and manufacturer co-defendants as beneficiaries.[41] Trust assets were intended to compensate a class (and subclasses) of persons with personal injury and contribution claims against the Trust. The *Findley* court certified the following class:

> All past, present and future Beneficiaries of the Manville Personal Injury Settlement Trust each of whom has or will have a claim either for wrongful death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of death or personal injury claims.

*Findley*, 878 F.Supp. at 575. The court designated six subclasses including three plaintiff subclasses and three defendant subclasses. *Findley*, 78 F.3d at 770. This was a mandatory, non opt-out settlement class, bound by the terms of a Stipulation of Settlement agreed to by the parties and subject to the procedures of the TDP, a document appended to that agreement. Classwide settlement was designed to remove the Trust from the tort system and equitably distribute limited Trust assets among its beneficiaries. *Findley*, 878 F.Supp. at 491–95. The class was certified as a limited fund settlement class, pursuant to F.R.C.P. 23(b)(1)(B),[42] by the United States District Court.[43] The Bakers are members of this mandatory, non opt-out class.

¶ 5 The *Findley* settlement seeks to preserve a limited fund for the entire class and prevent exhaustion of the fund through early claims against it. *Findley*, 878 F.Supp. at 564. The *Findley* Court found the Trust's "liabilities far outweigh its assets and, absent the instant class action, the current piecemeal liquidation and payment of some claims at full value by the Trust would deplete the Trust's assets and would deprive most present and future Beneficiaries of their right to be compensated for their claims by the Trust." *Id.*

¶ 6 When Mr. Baker accepted the Trust's offer of settlement, he signed a "Manville Trust Disposition Process Joint Tortfeasor Release Amended for the State of Pennsylvania," which provided in pertinent part:

> In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Trust as a joint tortfeasor legally responsible for my injuries shall be re-

---

**41.** Specifically, Trust beneficiaries include:
(a) persons suffering, or who will in the future suffer, from asbestos-related diseases caused in whole or in part by exposure to Manville asbestos or asbestos-containing products, (b) entities formerly joined with Manville as co-defendants in asbestos-related litigation, and (c) manufacturers and distributors of Manville asbestos or asbestos-containing products who have claims against Manville for indemnity or contribution.
*Findley*, 78 F.3d at 769.

**42.** F.R.C.P. 23(b)(1)(B) provides for the maintenance of a mandatory, non opt-out class where:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of ...
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**43.** *See Findley*, 878 F.Supp. 473 and 78 F.3d 764, for a comprehensive history of the bankruptcy and class proceedings.

duced only by the amount of the Liquidated Trust payment as defined in Section H(3)(a)(i) of the TDP, *since it is the intention of the parties that this Joint Tortfeasor Release provide for a pro tanto reduction of any damages recoverable against all other tortfeasors, as provided in Section H(3) of the TDP, as applicable. This Joint Tortfeasor Release does not provide, and shall not be construed to provide, for a reduction, to the extent of the pro rata share of the Trust, of my damages recoverable against all other tortfeasors.* (Emphasis provided).tion H(3)(a)(i) of the TDP, *since it is the intention of the parties that this Joint Tortfeasor Release provide for a pro tanto reduction of any damages recoverable against all other tortfeasors, as provided in Section H(3) of the TDP, as applicable. This Joint Tortfeasor Release does not provide, and shall not be construed to provide, for a reduction, to the extent of the pro rata share of the Trust, of my damages recoverable against all other tortfeasors.* (Emphasis provided).

¶ 7 Thus, for $30,000, Mr. Baker gave· the Trust a release limiting its set-off to that amount (a *pro tanto* release). By contrast, when the Bakers settled with Owens–Corning Fiberglas Corporation, Pfizer, Inc., and Asbestos Claims Management Corporation, they executed releases providing for a *pro rata* set-off ($440,000 for each allocated share of the damages awarded).

¶ 8 The TDP provides that set-off is the preferred method of satisfying co-defendant claims. TDP § H.2. Set-off is to be calculated according to applicable state law. TDP § H.3. The TDP recognizes different rules for different categories of states: (1) *pro tanto* states, in which the judgment against a nonsettling defendant is reduced by the amount paid or agreed to · be paid by a released party; (2) *pro rata* states, in which the total liability is divided equally among all defendants found to be legally responsible tortfeasors, and the judgment is reduced by a released·party's *pro rata* share of liability; (3) apportion-

ment states, in which the amount of the judgment is to be reduced with reference to the apportioned share of a released or absent tortfeasor; (4) states where the law provides for several liability; and (5) states with multiple set-off rules. TPD § H.3 (b), (c), (d), (e) and (f). Moreover, with respect to *pro tanto* or *pro rata* states, the TDP alters state set-off rules by indemnifying the Trust against contribution claims arising from judgments obtained by health claimants[44] if a set-off credit is awarded by the trial court in accordance with the TDP and local law. *Findley,* 78 F.3d at 770–71.

¶ 9 Section H(3)(c) of the TDP governs the calculation of set-off in *pro rata* states:

> (c) *Pro Rata States.* In *pro rata* states, total liability is divided equally among all defendants found by the fact finder to be legally responsible tortfeasors (or agreed by the parties to be legally responsible tortfeasors, if applicable law so provides), including released parties. In such states, judgments against nonsettling defendants are reduced, as provided by applicable law, by either the *pro rata* share attributable to released parties. or the amount paid or agreed to be paid by released parties. Solely for the purposes of. obtaining a set-off in a *pro rata* state, pursuant to this subsection 3(c), regardless of whether the Trust has been given a release, or the wording of any such release, claimants in *pro rata* states shall be deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co–Defendants against the Trust arising from a judgment obtained by such claimants.
>
> *(i) Liquidated claims.* Where the underlying claim has been liquidated, the set-off amount shall be either (a) the Liquidated Trust payment, *or (b)* the Trust's *pro rata* share of the judgment, as provided by applicable law. *(ii) Unliquidated claims.* Where the underlying claim has not been liquidated, the set-off amount shall be either (a) the Unliquidated Trust payment, *or (b)* the Trust's *pro rata*

44. The Trust evaluated Mr. Baker's claim as an "Exigent Health and Extreme Hardship Claim" and offered $300,000, to be paid at 10%.

share of the judgment, as provided by applicable law.

¶ 10 Section H(3)(f) of the TDP governs the calculation of set-off in states with multiple set-off rules:

(f) *States with multiple set-off rules.* In some states, different set-off rules (*pro tanto, pro rata* or apportionment) govern different causes of action or parts thereof or different elements of damages. In such states, applicable law shall govern which set-off rules apply to each cause of action or part thereof and each element of damages.

¶ 11 Relying on *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992) and *Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650 (1993), the trial court determined Pennsylvania is a *pro rata* state in strict products liability cases. If correct in this conclusion, the trial court must be affirmed. By contrast, upon review of the law of contribution and set-off in Pennsylvania, the majority concludes Pennsylvania is a state with multiple set-off rules, because liability is allocated differently depending on the nature of the underlying cause of action. However, accepting the majority's proposition that Pennsylvania is a state with multiple set-off rules does not defeat the more precise proposition that Pennsylvania is a *pro-rata* state for purposes of this strict liability litigation.

¶ 12 The trial court found this reasoning dispositive:

Although the *Walton* court did not go on expressly to state that apportionment among strictly liable defendants must be on a pro rata basis, i.e., divided proportionately in accordance with the number of joint tortfeasors, this is clearly a necessary corollary of the *Walton* decision. Justice Papdakos, concurring in *Walton*, specifically interpreted the majority opinion in this manner, stating:

I join the majority opinion because I believe it says the following:

* * *

III. As between and among strictly liable defendants, any defendant who has settled with plaintiffs prior to verdict has settled for its pro-rata share of the verdict and is not entitled to contribution from any other defendant found strictly liable, whether the verdict is for a greater or lesser amount than the settlement amount.

The non-settling strictly liable defendants are obligated to the plaintiffs for a pro-rata share of the verdict and are not entitled to contribution from the settling, strictly liable defendants. *Id.* at 584–85, 610 A.2d at 463 (Papadakos, J., concurring).

Trial Court Memorandum, 9/11/96, at 3 (quoting *Ball*, at 658). The trial court found this to be an uncomplicated issue, resolved solely by § H(3)(c) of the TDP and the court's determination "[t]he gold standard of set-off in Pennsylvania products liability actions is a pro rata share." Trial Court Memorandum, 9/11/96, at 4. I must agree.

¶ 13 *Walton* was a strict products liability action arising from a helicopter crash. In *Walton*, the plaintiff gave a release to one defendant, stating any recovery against the nonsettling defendant must be reduced by the greater of the consideration paid (*pro tanto* ) or the settling defendant's *pro rata* share of liability. As it turned out, the defendant's settlement payment was greater than its *pro rata* share of the verdict. Nevertheless, the Supreme Court disregarded the *pro tanto* language of release and held the plaintiff's recovery would be reduced only by the settling defendant's *pro rata* share of the verdict. *Walton*, 610 A.2d at 463.

¶ 14 The *Ball* case was an asbestos action against several defendants on negligence and strict liability theories. Certain defendants filed for bankruptcy, others were dismissed on summary judgment and still others settled with the plaintiffs. The case resulted in a jury verdict against the two remaining defendants. On appeal, a panel of this Court was asked to determine whether the trial court properly refused to charge the jury on apportionment of liability among defendants, particularly where both negligence and strict liability are alleged. The Court found that although not barred by *Walton*, apportionment on negli-

gence grounds was barred for lack of sufficient evidence regarding relative causal fault. *Ball*, at 658–59. Significantly the Court also reasoned:

> Although the *Walton* court did not go on expressly to state that apportionment among strictly liable defendants must be on a pro rata basis, i.e., divided proportionately in accordance with the number of joint tortfeasors, this is clearly a necessary corollary of the *Walton* decision.

*Ball*, at 658.

¶ 15 Based on this reasoning, I must agree with the trial court: *Ball* and *Walton* mandate holding AC&S liable only for its *pro rata* share. In both *Walton* and the case on which it relied, *Charles v. Giant Eagle*, 513 Pa. 474, 522 A.2d 1 (1987), the settling tortfeasors paid in excess of their *pro rata* shares of allocated liability. Nevertheless, the respective courts required the non-settling tortfeasors to pay their full *pro rata* shares as well, based on policies of promoting settlement and avoiding windfalls to non-settling tortfeasors. I see no reason why this approach should not apply where the settling tortfeasor paid less than its full *pro rata* share (as is the case herein).

¶ 16 I see no basis for a rule that *pro tanto/pro rata* allocation depends on the ultimate ratio of settlement to verdict, as the majority's result suggests. Can the applicable principles of law change with the specific mathematics of the verdict? Does the law apply one standard when settlement exceeds the pro rata share, and another standard when it does not? I find neither logic nor fairness in such a dichotomous approach.

¶ 17 Moreover, I believe the TDP trumps the Baker/Trust release. It is important to understand certain aspects of the *Findley* class proceedings and how the parties resolved the final terms of the TDP. The TDP provides set-off is the "preferred method of satisfying Co-defendant claims." TDP § H(2)(a). Judge Weinstein acknowledged the TDP's set-off provisions are "byzantine," but that merely reflects the complexity of accommodating the laws of forty-nine states. *Findley*, 878 F.Supp. at 545. Judge Weinstein's comments in this regard are worth noting:

> The parties have done as well as they could to simplify administration. The parties were free to agree to modify the effect of state laws to accommodate the litigants as part of a class action settlement, and this is what they have done. The TDP is the product of full discussion among the parties; it is eminently fair. There is no evidence that any group's interests were not fully represented as to any state's law.

*Id.* The TDP and the Stipulation of Settlement were the result of extensive negotiations among the parties to the *Findley* litigation, including the parties herein. The District Court's class certification findings plainly show the parties were ably represented at those negotiations by the appointed representatives of their class and subclass. *Findley*, 878 F.Supp. at 563. Despite the fact they could not opt out of the class, the Bakers had ample notice of the class settlement proceedings and its effect on their claim against the Trust. Before final approval of the settlement class, the District Court held fairness hearings and gave purported class members adequate opportunity to object to settlement if they so desired. *See Findley*, 878 F.Supp. at 492–93. The record does not reveal whether the Bakers objected to the settlement, although the *Findley* decisions suggest their counsel was involved in the process that resulted in the TDP. In any event, as the majority points out, AC&S received valuable benefits from the settlement negotiations and similarly, the settlement assured the Bakers of some measure of damages, even if less than desired.

¶ 18 It may seem unjust that the Trust pays less than its joint tortfeasor, AC&S, but this is a reflection of the limited fund nature of the class settlement. The District Court approved the limited fund settlement class "to ensure some payment to all claimants," *Findley*, 878 F.Supp. at 480,

and concluded "the Settlement was a fair one founded on a delicate balancing of interests." *Findley*, 78 F.3d at 779. Absent the refuge of limited fund status for the Trust, the Bakers conceivably could have received *no* recovery for their claims. *Findley*, 878 F.Supp. at 564 ("... payment of some claims at full value by the Trust would deplete the Trust's assets and would deprive most present and future beneficiaries of their right to be compensated for their claims by the Trust").

¶ 19 There is no reason to disregard the hard-fought negotiations of the parties in *Findley*, and the resulting balancing of interests, to give effect to a side agreement between two of the parties, especially where doing so would require a remaining party to pay almost twice the share otherwise required under the TDP and Pennsylvania law.

¶ 20 To summarize, I agree with the trial court: under *Walton* and *Ball*, Pennsylvania is clearly a *pro rata* state for purposes of set-off in strict liability cases such as this one. I find no abuse of discretion in the trial court's interpretation of the TDP; the amount of set-off for the Trust's share of liability to the Bakers is a *pro rata* share, $440,000. Opinion Sur Post–Trial Motions, 1/16/97 at 4–5.; Trial Court Memorandum, 9/11/96, at 3–4. Under the terms of the TDP, and under *Walton* and *Ball*, claimants including the Bakers, must be deemed to have given the Trust a *pro rata* joint tortfeasor release regardless of the wording of the actual release.

¶ 21 The Uniform Contribution Among Tortfeasors Act (UCATA)[45] does not compel a different result since under *Ball*, application of the UCATA is not required in strict liability actions:

> As between and among strictly liable defendants, any defendant who has set-

tled with plaintiffs prior to verdict has settled for its pro-rata share of the verdict and is not entitled to contribution from any other defendant found strictly liable, whether the verdict is for a greater or lesser amount than the settlement amount. The non-settling strictly liable defendants are obligated to the plaintiffs for a pro-rata share of the verdict and are not entitled to contribution from the settling, strictly liable defendants.

*Ball*, 625 A.2d at 658 (quoting *Walton*, 610 A.2d at 463 (Papadakos, J., concurring)).

¶ 22 For the foregoing reasons, I would affirm the learned trial court, and am constrained to dissent from the holding of the majority.

¶ 23 President Judge McEWEN and Judge JOYCE join this Dissenting Opinion.

---

**45.** The UCATA provides in pertinent part:

A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid. 42 Pa.C.S. § 8326.