755 A.2d 664

Suzanne BAKER, Administratrix of the Estate of Albert J. Baker, and wife of Albert J. Baker, Appellee

v.

ACANDS; Amchem Products, Inc.; American Energy Products, Inc.; Anchor Packing Co.; Armstrong World Industries, Inc.; Asbestos Products Mfg. Corporation; Atlas Turner, Ltd.; Basic Incorporated; Carey Canada; Celotex Corporation; Dana Corporation; DI Distributors, Inc., f/k/a Delaware Insulation Co.; Eagle Picher Industries, Inc.; Fibreboard Corporation; Foster Wheeler Corporation; GAF Corporation; Garlock, Incorporated; Georgia–Pacific Corporation; H & A Construction, Inc.; a/k/a Crane Packing Co.; Keene Corporation; National Gypsum; Owens–Corning Fiberglass; Owens–Illinois, Inc.; Pfizer, Inc.; Pittsburgh Corning Corporation; Raymark Industries, Inc.; Rock Wool Manufacturing Co.; Smith & Kanzler; Southern Textile Corporation; Spray–Craft Corp.; Sprayon Research Corporation; T & N PLC.; U.S. Mineral Products; United States Gypsum Co.; W. & R. Grace Co.

Appeal of ACandS, Inc.

Supreme Court of Pennsylvania.

Argued Feb. 1, 2000.

Decided June 26, 2000.

Reconsideration Denied Aug. 7, 2000.

Robert W. Rowan, Philadelphia, for AC&S, Inc.

R. Bruce McElhone, for Suzanne Baker.

Edward J. Wilbraham, Philadelphia, for Amicus-Claims Res. Member.

Jonathan W. Miller, Boiling Springs, Martin Greitzer, Philadelphia, for Amicus-Abestos Clients.

Eilihu Inselbuch, for Amicus-Mansville Trust.

Robert N. Spinelli, Philadelphia, for Amicus-Owens-Corning.

Theodore Goldberg, for Amicus-Pa. Trial Lawyers Assoc.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

CAPPY, Justice.

## OPINION

The question at issue concerns which method of set-off applies in this strict liability matter: *pro tanto* or *pro rata* set-off. For the following reasons, we find that *pro tanto* methodology of set-off is warranted. Accordingly, we now affirm the order of the Superior Court.

Albert and Suzanne Baker filed a civil action against several manufacturers and/or sellers of asbestos-containing products, seeking damages resulting from Mr. Baker's exposure to asbestos and Mrs. Baker's loss of consortium. This first complaint was dismissed without prejudice on January 13, 1994 as Mr. Baker had not manifested any symptoms, impairment, or disability due to his exposure to asbestos.

Mr. Baker subsequently developed malignant mesothelioma. The Bakers amended their complaint and reactivated their case on March 31, 1995. The trial was reverse-bifurcated, with the medical causation and damages phase being tried before a jury. On June 2, 1995, the jury entered an award of $2,000,000.00 in favor of Mr. Baker and $200,000.00 for Mrs. Baker's loss of consortium claim.

Prior to the start of the liability phase, several defendants were dismissed from the case on motions for summary judgment. Additionally, the Bakers settled with four of the remaining defendants. The joint tortfeasor settlement agreements the Bakers executed with Owens–Corning Fiberglass Corporation ("Owens–Corning"), Pfizer, Inc. ("Pfizer"), and Asbestos Claims Management Corporation ("ACME") (formerly known as National Gypsum) specified that they were *pro rata* releases.[1]

1. Where a plaintiff and settling defendant sign a *pro tanto* release, then the plaintiff's ultimate recovery against the nonsettling joint tortfeasors is the total award of damages reduced by the amount of consideration paid for the release. In contrast, if the parties sign a *pro rata* release (which is also known as an "apportioned share set-off" release), then the plaintiff's ultimate recovery against the nonsettling tortfeasors is the total award of damages reduced by the settling party's allocated share

The Bakers also settled with the Manville Personal Injury Settlement Trust ("the Manville Trust") pursuant to a joint tortfeasor release. As stated by the Superior Court below, the Manville Trust was created in 1988 "to pay all health claims brought against the Johns–Manville Corporation ('Manville') as a result of asbestos exposure." Super. Ct. slip op. at 6. The settlement agreement the Bakers and the Manville Trust executed specified that the release was a *pro tanto* release, for which the Manville Trust paid $30,000 in consideration.[2]

Prior to the commencement of the liability phase, Mr. Baker died. Mrs. Baker, as administratrix of Mr. Baker's estate, was thereafter substituted as a party for Mr. Baker. At the liability phase of the trial, the only remaining defendant was ACandS, against whom Mrs. Baker proceeded on a strict liability theory only. The trial court, sitting without a jury, found ACandS, Owens Corning, Pfizer, ACME, and the Manville Trust jointly liable. The trial court proceeded to apportion the damages among each of these defendants, determining that each was responsible for an equal, one-fifth share of the award, or $440,000.00.

The trial court then turned to the question of which set-off method should apply in determining how much of the Manville Trust's portion of the verdict ACandS could set-off. The trial court rejected Mrs. Baker's contention that the *pro tanto* method applied, and instead applied the *pro rata* method, thereby setting off the Manville Trust's entire $440,000.00

of the liability. *See generally* L. Kornhauser and R. Revesz, *Settlements Under Joint and Several Liability*, 68 N.Y.U.L.Rev. 427 (1993).

2. The $30,000.00 figure was arrived at pursuant to the figure given by the Manville Trust Disposition Process ("TDP"). The TDP controls the allocation of funds to persons with claims against the Manville Trust.

The TDP has its genesis in a class action suit filed in 1990 to restructure the Manville Trust after it became apparent that the assets of Manville Trust would cover only approximately one tenth of anticipated claims. The goal of the TDP was to spread the burdens of the Manville Trust's limited resources over all claimants. Thus, all claimants are to get some compensation, although no award will come close to compensating the claimants in full. This was a mandatory, non-opt-out settlement class.

share of the verdict. Thus, it entered judgment against ACandS (the only non-settling, remaining defendant) in the amount of $440,000.00.[3]

Both Mrs. Baker and ACandS appealed to the Superior Court. Mrs. Baker claimed that the terms of the *pro tanto* release between her and the Manville Trust should be enforced. The effect of enforcing the terms of the release would be that ACandS would be liable for the $410,000.00 shortfall between the consideration the Manville Trust paid in settlement (i.e., $30,000.00) and the Manville Trust's allocated share of the damages awarded to the plaintiff (i.e., $440,000.00). ACandS appealed to the Superior Court on the basis that the evidence was insufficient to show that it was liable.

The procedural history of this matter before the Superior Court is rather involved. Initially, a three-judge panel of the Superior Court filed an opinion on May 18, 1998; this opinion was withdrawn by order of the court on June 1, 1998. On June 2, 1998, another opinion was filed in this matter which affirmed the order of the trial court. Subsequently, on July 30, 1998, the court granted reargument on the motion of Mrs. Baker. Our analysis of this matter is limited to a discussion of the Superior Court's *en banc* opinion which was filed on March 30, 1999. In that opinion, the Superior Court rejected ACandS' claim that the evidence was insufficient to support the verdict; it therefore affirmed that portion of the trial court's order which denied ACandS' motion for judgment notwithstanding the verdict.

The majority of the Superior Court, however, found that the trial court erred when it did not enforce the terms of the *pro tanto* release, and therefore reversed the trial court's denial of Mrs. Baker's request to mold the verdict pursuant to the *pro tanto* release. Thus, the Superior Court directed that Mrs. Baker could recover from ACandS the shortfall between the consideration she received from the Manville Trust in the

---

**3.** The trial court also assessed delay damages against ACandS in the amount of $17,386.00. We note that the calculation of delay damages is not at issue in this appeal.

settlement and the amount of the Manville Trust's share of the damages.

■ ACandS subsequently filed a petition for allowance of appeal. ACandS abandoned its sufficiency of the evidence claim in its request that this court hear its appeal, and instead presented the sole issue of whether the Superior Court's determination of the set-off issue was correct. We granted allocatur.[4]

At the outset of our review, we note that the parties agree that they are bound by the terms of the TDP. The TDP, in turn, contains a rather involved mechanism for determining how set-off is to be calculated. TDP § H.3. Mrs. Baker and ACandS disagree about which particular subsection of TDP § H.3 applies to this matter. These arguments are fairly complicated. Yet, it is not necessary for us to resolve the rather thorny issue of which of these particular subsections of the TDP applies as both of these subsections declare that the method for performing the set-off calculation is to be made with reference to state law. *See* TDP H.3.(c) and (f). Thus, we can now turn to the crux of this dispute, which is whether state law mandates that ACandS should receive a *pro tanto* or *pro rata* set-off.

To answer this question, we turn to the Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S. §§ 8321–8327 ("UCATA"). This is a comprehensive act which dictates the effect of a release as to other tortfeasors, the method for computing set-off, and under what circumstances an action in contribution is to be allowed. The provision which controls set-off is found at 42 Pa.C.S. § 8326. That provision states that a release by the plaintiff of one tortfeasor

> does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the

4. As the question before us is one of law, our scope of review is plenary. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995). Furthermore, our standard of review requires us to examine the lower tribunal's ruling for an abuse of discretion or error of law. *See In re T.J.*, 559 Pa. 118, 739 A.2d 478, 481 (1999).

release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S. § 8326.

Thus, in Pennsylvania, the UCATA contemplates three separate set-off scenarios. First, if the settlement agreement is silent, the set-off mechanism defaults to a *pro tanto* set-off and the nonsettling defendant is entitled to have the verdict reduced by the amount of consideration paid by the settling tortfeasor. In the second scenario, where the settlement agreement specifically provides for a *pro tanto* set-off, the UCATA envisions that such a specific election will always control.

The third scenario is where the settlement agreement specifies a form of set-off other than a *pro tanto* set-off. As stated above, § 8326 provides that the settling parties may opt for another set-off "in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid." 42 Pa.C.S. § 8326. In other words, the settling parties may opt for a set-off mechanism such as a *pro rata* set-off. Application of such a *pro rata* set-off would allow the nonsettling tortfeasor to reduce the amount of money owed to the plaintiff in an amount equal to the settling defendant's apportioned share of the verdict. For example, suppose that there are two joint tortfeasors and one settles prior to trial pursuant to a *pro rata* release. It is subsequently determined that each joint tortfeasor is liable for 50% of a $100,000.00 verdict. The nonsettling tortfeasor is entitled to have the $100,000.00 verdict, the entirety of which it is obligated to pay as a joint and severally liable tortfeasor, reduced by $50,000.00, or 50% of the verdict.

Yet, the UCATA does place restrictions on when a specific *pro rata* election will be allowed to operate. Section 8326 specifies that such a choice will become operative only if such a *pro rata* set-off would yield a set-off figure which is higher than the consideration paid by the settling tortfeasor. To employ the same example used *supra,* if the consideration

actually paid for the settlement was $60,000.00, the *pro rata* election would not become operative because the *pro rata* share of $50,000.00 is less than the amount paid in settlement. In such a scenario, the *pro tanto* set-off figure would apply.

■ Application of 42 Pa.C.S. § 8326 to the matter *sub judice* reveals that ACandS should receive a *pro tanto,* rather than a *pro rata,* set-off. The settlement agreement entered into by the Bakers and the Manville Trust specified that it was a *pro tanto* release. Furthermore, the release stressed that it "does not provide, and shall not be construed to provide, for a reduction, to the extent of the pro rata share of the [Manville] Trust, of [the Bakers'] damages recoverable against all other tortfeasors." Bakers–Manville Trust Settlement Agreement, dated May 31, 1995, at 3. Thus, set-off is capped at the amount of consideration paid by the Manville Trust to the Bakers.

■ ACandS, however, argues that the only form of set-off allowed in this matter is *pro rata.* It presents several arguments in support of this point. Its first such argument is that the UCATA, which would compel a *pro tanto* set-off under the facts of this case, applies only in negligence cases, and has no application to strict liability matters. In support of this argument, ACandS relies on the Superior Court's decision in *Ball v. Johns–Manville Corp.,* 425 Pa.Super. 369, 625 A.2d 650, 658 (1993).

We reject ACandS' argument for several reasons. First, our own reading of *Ball* leads us to conclude that the Superior Court in that matter did not hold that the UCATA applies only to negligence, rather than strict liability, actions.

Second, to the extent that *Ball* can be read for the proposition that the UCATA has no application in strict liability actions, it was wrongly decided. This court has never interpreted the UCATA as applying only to negligence actions. The portion of *Ball* which ACandS claims stands for the proposition that UCATA does not apply in strict liability actions is nothing more than a direct quote from Mr. Justice Papadakos' concurring opinion in *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454 (Pa.1992). Again, we find nothing in

that concurring opinion in *Walton* which would stand for the proposition that UCATA is inapplicable in strict liability actions. Furthermore, even if we assume *arguendo* that the concurring opinion did stand for such a proposition, such a conclusion would be of no moment. That concurring opinion was not joined by any other justice, and thus clearly is of no precedential value.

Finally, we can find no support in the UCATA itself for the proposition that it applies only in negligence actions. The language of the UCATA is very broad and clearly applies to all types of actions. If we were to adopt ACandS' analysis, and limit the UCATA to negligence actions, we would essentially be engrafting a limitation on the statute which the legislature did not see fit to impose. This we decline to do.

■ Next, ACandS contends regardless of what the UCATA provides, set-off in strict liability actions can only be *pro rata.* In support of this conclusion, ACandS asserts that joint tortfeasors in a strict liability action are liable only for their respective, equally apportioned shares of the verdict; they cannot be compelled to pay more than their equally apportioned shares and have no right to contribution. As a corollary, ACandS claims that "settlement by one joint tortfeasor reduces the liability of a non-settling defendant by the settling defendant's *pro rata* share and not the consideration paid for a release." ACandS' Brief at 21. In support of its argument, ACandS relies heavily on this court's decisions in *Walton, supra,* and *Charles v. Giant Eagle,* 513 Pa. 474, 522 A.2d 1 (1987).

■ This analysis is faulty for several reasons. First, ACandS misapprehends the interaction between apportionment of liability for the injury and the principle that one joint tortfeasor may be compelled to satisfy the entire money judgment pursuant to the doctrine of joint and several liability. In strict liability actions, liability is indeed apportioned equally among joint tortfeasors. *Walton, supra.* In a strict liability action, apportionment based upon fault is impermissible as this tort theory does not contain an element of fault.

This is in contrast to negligence actions where liability is allocated among joint tortfeasors according to percentages of comparative fault. 42 Pa.C.S. § 7102.

■ Yet, the declaration that liability is to be apportioned equally in a strict liability matter is not synonymous with the proposition that a tortfeasor may be compelled to pay only its share of the judgment and no more. In Pennsylvania, joint tortfeasors, including those in strict liability actions, are jointly and severally liable. *See Incollingo v. Ewing,* 474 Pa. 527, 379 A.2d 79, 85 (1977). Thus, the plaintiff may recover the entire damages award from only one of the joint tortfeasors. That joint tortfeasor's recourse for paying more than its proportionate share of the verdict is to sue the nonpaying joint tortfeasors in contribution. *See* 42 Pa.C.S. § 7102; 42 Pa.C.S. §§ 8324(c) and 8327.

■ Second, ACandS is incorrect in its conclusion that joint tortfeasors in a strict liability matter have no right to seek contribution from each other. ACandS draws this conclusion from this court's decision in *Walton, supra.* In that matter, Glenda Walton sued Avco Corporation ("Avco") and Hughes Helicopter, Inc. ("Hughes") on a theory of strict liability. Avco settled with Walton prior to trial for $922,355.00. The settlement agreement between Avco and Walton stated, *inter alia,* that Avco preserved its right to recover against Hughes in contribution; the settlement agreement executed by the Walton and Avco release did not, however, release Hughes from liability to Walton.

The matter went to trial against Hughes alone; the jury returned a verdict in favor of Walton in the amount of $891,203.00. Avco then sought contribution from Hughes; the trial court granted this request, and awarded contribution to Avco against Hughes in the amount of fifty percent of the jury's award in the Walton case.

On appeal to this court, the question presented was whether Avco could recover in contribution against Hughes, or whether Hughes owed its share of the verdict to Walton. This court found that Avco had no right of contribution against Hughes.

Although recognizing that the Walton–Avco settlement agreement purported to preserve Avco's right of contribution against Hughes, we found this portion of the settlement unenforceable because Avco could not "reserve a right to contribution that it did not have in the first place." *Walton,* 610 A.2d at 461. ACandS focuses on this statement, claiming that it stands for the proposition that contribution is never allowed among joint tortfeasors in a strict liability context.

ACandS is incorrect. This passage in *Walton* was not focusing on the fact that the action sounded in strict liability. Rather, we stated that Avco was barred from instituting a contribution action because Avco's settlement agreement with Walton had not released Hughes from liability as well. We stated that unless a settlement agreement releases the nonsettling as well as the settling joint tortfeasor, the settling joint tortfeasor may not pursue a contribution action against the joint tortfeasor who chose to encounter the uncertainties of litigation. *Id.*[5] We in no fashion, however, stated that an action in contribution cannot be maintained in the context of a strict liability lawsuit.

ACandS' citation to *Charles, supra,* is similarly unavailing. In *Charles,* Giant Eagle Markets ("Giant Eagle") and Stanley Magic Door ("Stanley") were sued by George Charles ("Charles"). Giant Eagle settled prior to trial for $22,500.00; in that release, the settling parties stated that any verdict Charles obtained would be set-off by Giant Eagle's *pro rata* share.

The matter then proceeded to trial against Stanley alone. The jury returned a verdict in which it set the damages at $31,000.00 and found Giant Eagle sixty percent negligent and Stanley forty percent negligent. Thus, Giant Eagle's proportionate share of the verdict was $18,600.00, $3,900.00 less than what it had paid in settlement.

5. While this portion of our *Walton* opinion did not make specific reference to the UCATA, this passage was clearly paraphrasing 42 Pa.C.S. § 8324(c) of the UCATA. That provision of the UCATA states that a settling joint tortfeasor "is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement."

This presented a situation where either Charles or Stanley would receive a windfall: if Charles recovered Stanley's $12,400.00 share of the verdict from Stanley, Charles would have received $3,900.00 more for his injury than the amount at which the jury had valued it; on the other hand, if Stanley were given a *pro tanto* set-off representing the amount of consideration paid in settlement by Giant Eagle, Stanley would pay $3,900.00 less than its share of liability as found by the jury.

We determined that in windfall situations such as that presented by *Charles*, the plaintiff rather than the nonsettling tortfeasor should benefit. We stated that the maximum that a nonsettling tortfeasor's liability may be set-off is the portion of the verdict apportioned to the settling tortfeasor. In other words, the nonsettling tortfeasor may not enjoy a set-off which would lower its out-of-pocket expense below its own allocated share of the liability. We thus opted for the *pro rata* set-off method, and required Stanley to pay its full share of the verdict.

*Charles*, however, does not command that ACandS is entitled to a *pro rata* set-off. First, the rationale of *Charles* would actually allow the choice of *pro tanto* set-off specified in the Bakers–Manville Trust settlement agreement to be operative. We stated in *Charles* that the settling parties could opt for a set-off method so long as the portion of the verdict apportioned to the settling tortfeasor exceeded the consideration paid for the release. *Id.* at 4. As the Manville Trust's $440,000.00 share of the verdict clearly exceeds the $30,000.00 it paid in the settlement agreement with the Bakers, the *pro tanto* choice of set-off is operative pursuant to *Charles*.

Furthermore, *Charles* is not directly on point with the matter *sub judice*. The driving force behind the *Charles* decision was that we were dealing with a windfall situation. The matter *sub judice*, however, is not a windfall situation. We are not being asked to choose between results where either Mrs. Baker would recover more than the jury's verdict or ACandS would pay less than its $440,000.00 share. The peculiar policy concerns which compelled this court's decision

in *Charles* are simply absent from this matter. Thus, ACandS' contention that it can utilize the *Charles* holding to support its claim that it is entitled to a *pro rata* set-off, and thus avoid application of 42 Pa.C.S. § 8326, are unavailing.[6] We therefore hold that the Superior Court correctly determined that the appropriate set-off method in the matter *sub judice* is *pro tanto.*

Finally, ACandS contends that even if this court agrees with the Superior Court that the set-off method here is *pro tanto,* the Superior Court nonetheless erred in its computation of the set-off. ACandS contends that the Superior Court concluded that after the *pro tanto* set-off was effectuated, ACandS would be liable for its $440,000.00 share of the verdict plus the $410,000.00 shortfall between the Manville Trust's share of the verdict and the consideration that the Manville Trust paid to the Bakers in settlement. ACandS claims this is an erroneous way to calculate the *pro tanto* set-

**6.** The majority opinion in *Charles* expressed the view that § 8326 could be squared with its holding. In particular, it focused on the language that the set-off was to be in the amount of the consideration paid "or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid." 42 Pa.C.S. § 8326. The majority read this provision as stating that the settling parties could opt for a *pro tanto* set-off so long as such a *pro tanto* set-off would not exceed the settling tortfeasor's proportionate share of the verdict. *Charles,* 522 A.2d at 4.

   Mr. Justice Zappala dissented vigorously in *Charles,* contending that the majority was rewriting § 8326. He claimed that the plain meaning of § 8326 was the exact opposite of what the majority made it out to be. Specifically, he claimed that § 8326 stands for the proposition that "if the proportion of reduction provided by the release is greater than the amount of consideration paid for the release, such proportion of reduction prevails, but if, on the other hand, the consideration paid for the release is greater than the proportion of reduction provided by the release, then the amount of the consideration paid for the release prevails." *Charles,* 522 A.2d at 12 (citation omitted) (Zappala, J., dissenting).

   We are not able to reassess at this juncture the rationale advanced by the majority and the position espoused by our learned colleague Mr. Justice Zappala in the *Charles* matter. As stated *supra,* the matter *sub judice* does not present a windfall situation and thus is not squarely on point with *Charles.* We must therefore wait for a matter where a windfall situation is presented if we choose to revisit our holding in *Charles.*

off. Rather, it contends that the proper method to calculate the *pro tanto* set-off would be first to reduce the entire $2,200,000.00 verdict by $30,000.00. Only at that juncture, ACandS posits, should the court apportion shares of liability. ACandS proposes that in apportioning these shares, the $2,170,000.00 should be divided four ways, with ACandS, Owens Corning, Pfizer, and ACME each being accorded an equal share. ACandS does not, however, propose allocating a share of the liability to the Manville Trust in its computation. If ACandS' proposed calculations were utilized, the proportionate share of the verdict for ACandS, Owens Corning, Pfizer, and ACME would be $542,500.00. As Owens Corning, Pfizer, and ACME executed *pro rata* releases, ACandS would be liable for only its $542,500.00 share of the verdict.

We find that ACandS' method of computing the set-off to be erroneous. The primary flaw that we perceive with ACandS' method is that the Manville Trust is on one hand considered a responsible tortfeasor, and thus ACandS is allowed to take a set-off which takes into account the Bakers–Manville Trust settlement agreement, and yet on the other hand, the Manville Trust is not apportioned an equal share of the liability. These two principles seem irreconcilable. The UCATA provides that a non-settling defendant is not entitled to a set-off in light of the settling defendant's release unless the settling and non-settling defendants are both deemed to be joint tortfeasors. 42 Pa.C.S. § 8326. Therefore, ACandS would not be entitled to a set-off unless the Manville Trust is deemed a joint tortfeasor. Once the Manville Trust is deemed to be a joint tortfeasor, then ineluctably it must be apportioned an equal share of the liability. *See Walton, supra.* In light of these basic principles of law, we cannot see how it is possible for us to adopt ACandS' position which on one hand views the Manville Trust as a joint tortfeasor, and on the other avoids apportioning an equal share of the liability to the Manville Trust.

We realize that it could be argued that by reducing the $2,200,000.00 verdict by the $30,000.00 the Manville Trust paid in settlement, the Manville Trust's share of the liability has

been accounted for and there is no avoidance of apportioning liability to all joint tortfeasors. Yet, this is also problematic. If we were to deem that the consideration paid by the Manville Trust effectively satisfies the entirety of the Manville Trust's share of liability, we would in essence be stating that the set-off allowed here is *pro rata* in nature as the Manville Trust's apportioned share of liability would be reduced to zero. That, of course, runs counter to our analysis conducted *supra* wherein we concluded that ACandS is entitled to a *pro tanto* set-off.

We therefore find that the proper method in calculating set-off is first to apportion shares of liability. In the matter *sub judice*, the trial court correctly determined that in this strict liability action, the verdict was to be apportioned equally among ACandS and the four settling defendants. *See Walton, supra.* Thus, each defendant's share of the liability is $440,-000.00.

The next step in this process is to determine which set-off method applies with regard to each individual settling tortfeasor. As the settlement agreements between Mrs. Baker and Owens Corning, Pfizer, and ACME each provided for a *pro rata* set-off, ACandS will be allowed to set-off each of these defendants' apportioned shares of the verdict, or an aggregate of $1,320,000.00. As to the Manville Trust's share, ACandS is entitled to a *pro tanto* settlement in the amount of $30,000.00.[7] Thus, ACandS is jointly and severally liable for both its share of the verdict as well as the shortfall between the Manville

---

**7.** We are aware of the fact that a federal district court, in calculating what the set-off which would be allowed for the Manville Trust's share pursuant to Maryland law, adopted a method of calculation which is similar to the one proposed by ACandS. *Findley v. Falise,* 929 F.Supp. 1 (E.D.N.Y.1996). Yet, that opinion does not aid us in analyzing this issue. The learned district court judge provided no reasoning for his holding other than the bald statement that "[i]t is not consonant with Maryland law to treat any release involving the Manville Trust strictly as a pro tanto or pro rata release as ordinarily contemplated by Maryland law." *Id.* at 8. Without providing any analysis beyond that simple statement, we are unable to conclude that the approach crafted by the *Findley* court is a sound one.

Trust's share and the $30,000.00 it paid in settlement, or for $850,000.00.[8]

For the foregoing reasons, we affirm the order of the Superior Court.

Justice SAYLOR files a concurring opinion in which Justice ZAPPALA and Justice NEWMAN join.

SAYLOR, Justice, concurring.

I join in the majority's disposition and in its assessment of the general application of Pennsylvania jurisprudence with respect to written releases. I write, however, because, in light of the binding class action settlement effectuated among the Manville Trust, asbestos health claimants, Manville codefendants and others, I consider this case to be, first and foremost, a "Trust" case. The majority concludes that all paths through the operative Trust instrument (the Trust Disposition Process or "TDP") lead to the same destination, namely, the direct application of Pennsylvania law to the *pro tanto* release consummated between the Trust and the Bakers; therefore it is able to avoid a detailed review of the TDP. As a central point of their arguments, however, Appellant ACandS, Inc. and its *amicus curiae* contend that a provision of the TDP implicated by following the single, proper pathway through the document engrafts additional substantive terms upon the Baker/Trust release *prior to* the application of Pennsylvania law, and thus, that the true question presented in this appeal is: what effect does Pennsylvania law give to the Baker/Trust release *as modified by the TDP?* As I agree with ACandS's position on

---

**8.** We note that in most situations where a settling defendant has executed a *pro tanto* release and the amount of consideration paid for the release is less than what the fact finder ultimately deems to be the settling defendant's apportioned share of the liability, the nonsettling defendant who pays the plaintiff for this shortfall is entitled to sue the settling defendant in contribution. *See* 42 Pa.C.S. § 8327. Yet, it appears that ACandS does not have this avenue available to it. In an effort to preserve the limited funds available, the TDP has sharply curtailed contribution rights so that very few co-defendants may initiate such an action against the Manville Trust. *See* TDP H.2.–4. It does not appear that the TDP will allow ACandS to bring a contribution action which stems from the matter *sub judice.*.

this point, I would address its argument and answer the question that it presents as follows.

Preliminarily, I note that the lead and dissenting opinions from the *en banc* Superior Court panel present careful examinations of a series of threshold questions pertinent to the present appeal; therefore, a close review of those expressions provides essential context. Judge Schiller, writing for the Superior Court majority, initially framed the primary issue as "whether in the context of a strict liability action pursuant to the provisions of the Uniform Contribution Among Tortfeasors Act . . ., and applicable case law, a *pro tanto* release executed by the plaintiffs in favor of the Manville Trust should be enforced according to its express terms to reduce the plaintiffs' recovery against the non-settling tortfeasor." *Baker v. AC&S, Inc.*, 729 A.2d 1140, 1144 (Pa.Super.1999).[1] The majority then reviewed the historical background of the Manville Trust; the broad-scale settlements among the Trust, asbestos health claimants, Manville codefendants in asbestos-related actions, and distributors of Manville products; and the resulting Manville Trust Disposition Process (the "TDP"), the operative document by which the parties agreed that their rights and remedies should be governed. In summary, in response to the assertion of massive claims, Johns–Manville Corporation, manufacturer and distributor of asbestos products, filed a bankruptcy petition, and the Trust was established to succeed to Johns–Manville's massive asbestos-related liabilities. The Trust was subsequently restructured in light of the fact that the value of Trust assets (no more than $2.5 million) was dwarfed by projected claims (between $21 and $25 billion). In connection with such restructuring, the district court certified a mandatory, non-opt-out class of asbestos health claimants, codefendants, distributors and certain others as beneficiaries. *See In re Joint Eastern and Southern Districts Asbestos*

---

1. Judge Schiller also restated the issue to focus more closely upon the effect of its resolution, as follows: "whether under the unique circumstances of this case the plaintiffs or the non-settling tortfeasor should bear the burden of the shortfall between the consideration paid by the Manville Trust ($30,000) and its allocated share of the damages awarded to the plaintiff ($440,000), a difference of $410,000." *Id.*

*Litigation,* 878 F.Supp. 473, 579 (E.D.N.Y. & S.D.N.Y.1996), *aff'd in pertinent part,* 78 F.3d 764 (2d Cir.1996). The purpose of the settlement was to distribute equivalent shares of claims' values (scheduled at some ten-percent of the claims), and to maximize the finite assets available to Trust beneficiaries by significantly reducing the Trust's operating and litigation expenses. *See id.* All Trust beneficiaries became bound by the terms of a settlement stipulation requiring abidance by the terms of the TDP, "designed to remove the Trust from the tort system and equitably distribute limited Trust assets among its beneficiaries." *Baker,* 729 A.2d at 1156 (Eakin, J., dissenting)(citing *Joint Asbestos Litig.,* 878 F.Supp. at 491–95).

Judge Schiller's preliminary discussion constituted an acknowledgment of the centrality of the TDP to resolution of this action, as the parties to this appeal are Trust beneficiaries whose rights and remedies are governed by the TDP, *Baker,* 729 A.2d at 1145; accordingly, he proceeded with an overview of the document. The TDP allows a claimant, upon meeting certain threshold requirements, to treat the Trust as a "legally responsible tortfeasor" without introduction of further proof; deems the Trust to be a settled joint tortfeasor; limits the rights of co-defendants to obtain contribution against the Trust to a narrow set of circumstances; and, in some instances, permits co-defendants to obtain a reduction of a verdict in respect to the Trust, whether or not the claimant's direct claim against the Trust has been resolved. *See generally In re Joint Asbestos Litig.,* 78 F.3d at 770–71. While the setoff is ultimately measured by reference to applicable local law of contribution and verdict reduction or settlement credit, *see* TDP § H.3, the TDP initially imposes a different framework of rules for each of the following five categories of states: 1) *pro tanto* states, defined as those in which any judgment against a non-settling defendant is reduced by the amount paid or agreed to be paid by a released party, TDP § H.3.(b); 2) *pro rata* states, or states in which total liability is divided equally among all defendants found by the fact finder (or agreed by the parties) to be legally responsible tortfeasors

including released parties, and judgments against nonsettling defendants are reduced by either the *pro rata* share attributable to the released parties or the amount paid or agreed to be paid by the released parties, TDP § H.3.(c); (3) apportionment states, or states in which the amount of any judgment is reduced with reference to the apportioned share of released or absent parties, TDP § H.3(d); (4) states where the law provides for several liability with respect to all or part of a cause of action, TDP § H.3(e); and (5) states with multiple setoff rules, defined as states in which different setoff rules govern different causes of action or parts thereof or elements of damage, TDP § H.3(f).[2] The TDP also provides:

> Except as described below, in order to preserve the Trust's assets for payment of claims asserted by asbestos health claimants and to limit transaction costs of all parties, set-off credit shall be the preferred method of satisfying Co-defendant claims, regardless of whether the Trust and claimant have liquidated the underlying claim.

TDP § H.2(a).

As the parties' arguments focused upon the *"pro rata"* and "multiple setoff rules" categories, Judge Schiller reviewed the applicable TDP provisions. With respect to *pro rata* states, the specific term of the TDP addressing calculation of the amount of the setoff is as follows:

> Solely for the purpose of obtaining a set-off in a *pro rata* state pursuant to this subsection 3(c), regardless of whether the Trust has been given a release, or the wording of any such release, claimants in *pro rata* states shall be deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co–Defendants against the Trust arising from a judgment obtained by such claimants.

**2.** Notably, the federal district judge presiding over the settlement, Senior Judge Jack B. Weinstein, acknowledged that these provisions are "byzantine," but indicated that the complexity merely reflects the difficulty in accommodating the laws of 50 states. *See Joint Asbestos Litig.,* 878 F.Supp. at 545.

■■■■■■■■

(i) *Liquidated claims.* Where the underlying claim has been liquidated, the set-off amount shall be either (a) the Liquidated Trust Payment,[3] *or* (b) the Trust's *pro rata* share of the judgment, as provided by applicable law.

(ii) *Unliquidated claims.* Where the underlying claim has not been liquidated, the set-off amount shall be either (a) the Unliquidated Trust Payment, *or* (b) the Trust's *pro rata* share of the judgment, as provided by applicable law.

TDP § H.3.(c). With respect to states with multiple setoff rules, the TDP provides that "applicable law shall govern which set-off rules apply to each cause of action or part thereof and element of damages." TDP § H.3.(f). The Superior Court majority recognized that the TDP requires, in the first instance, an assessment of applicable state law to determine the pertinent Section H.3 category establishing the setoff rules in relation to the Trust's proportionate share of damages. In performing this assessment, it reviewed the concept of joint and several liability and the Uniform Contribution Among Tortfeasors Act,[4] and in particular, Section 8326 of the enactment, which provides, *inter alia,* that:

[a] release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S. § 8326. Moreover, also pursuant to Section 8327 of the UCATA, 42 Pa.C.S. § 8327, the release by the plaintiff does not relieve the settling tortfeasor from making contribution to a non-settling defendant, unless the release is given before the right to secure contribution has accrued and pro-

3. "Liquidated Trust Payment" and "Unliquidated Trust Payment" are defined under Section H.3.(a)(i) and (ii) of the TDP as the amount of the Trust's payment to the claim in circumstances in which the underlying claim has been liquidated or is unliquidated, respectively.

4. Act of July 9, 1976, P.L. 586, No. 142 § 2 (codified at 42 Pa.C.S. §§ 8321–8327)(the "UCATA").

vides for a reduction of the verdict to the extent of the settling tortfeasor's *pro rata* share of damages recoverable against all other tortfeasors, i.e., the release conferred is a *pro rata* one. Additionally, Judge Schiller noted that Pennsylvania law generally seeks to effectuate the terms of a release as written. *See Baker*, 729 A.2d at 1147. He provided the following context:

> a party who signs a general release waiving all claims and discharging all parties will be precluded from thereafter suing a party who did not contribute consideration toward the release. However, if a plaintiff wants to settle with one joint tortfeasor but preserve the right to sue others, he or she can sign a *pro tanto* or a *pro rata* release. If the plaintiff settles pursuant to a *pro tanto* release, the plaintiff reduces his or her recovery against a non-settling joint tortfeasor by the amount of consideration paid for the release. By contrast, if a plaintiff settles pursuant to a *pro rata* release, the plaintiff reduces his or her recovery against the non-settling joint tortfeasor by that tortfeasor's allocated share of the total liability. Therefore, except in limited circumstances discussed *infra*, the parties to a release have the *option* to determine the amount or proportion by which the total verdict shall be reduced against the non-settling tortfeasors to reflect the settling tortfeasor's share.

*Baker*, 729 A.2d at 1148 (citations omitted).

With this background, Judge Schiller undertook to categorize Pennsylvania jurisprudence within the framework of Section H.3 of the TDP. Because, under Pennsylvania law, liability is allocated differently depending upon the underlying cause of action,[5] and damages allocable to non-settling defen-

---

**5.** The opinion provides the following example of differing apportionment schemes under Pennsylvania law:

> In Pennsylvania, liability among joint tortfeasors is allocated differently in a negligence action than it is in a strict liability action. In a negligence action, liability is allocated among responsible tortfeasors according to percentages of comparative fault. Thus, a "pro rata" set-off is calculated based on the settling party's percentage of negligence as determined by the factfinder. However, in strict liability

dants depend upon the terms of the release provided to the settling defendant, *see* 42 Pa.C.S. §§ 8326–8327, the Superior Court majority determined that Pennsylvania falls most appropriately within the Section H.3.(f) category of states with multiple setoff rules. *Baker,* 729 A.2d at 1148. Judge Schiller then read Section H.3.(f) as requiring only the application of Pennsylvania law to the provisions of the Baker/Trust release, with no further reference to the other provisions of the TDP.[6] The opinion also indicated that, even if Pennsylvania were treated as a *pro rata* state, the TDP provides precisely the same treatment, since Section H.3(c) specifies that the amount of setoff is *either* the amount actually paid to the plaintiff by the Trust *or* the Trust's *pro rata* share of the judgment, *as determined by reference to applicable law. Id.* at 1148–49 n. 23.[7]

The majority then turned to Pennsylvania law to determine setoff, performing an analysis of *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454 (1992), *Ball v. Johns–Manville Corp.,* 425

cases, as in the case *sub judice,* liability is allocated equally among responsible tortfeasors, without regard to fault. Thus, a "pro rata" setoff is calculated based upon the total liability divided by the number of defendants.

*Baker,* 729 A.2d at 1148 (citations omitted). Judge Schiller also noted that, in certain circumstances, Pennsylvania law allows for the imposition of several liability. *See id.* at 1148 n. 22 (citing *Glomb v. Glomb,* 366 Pa.Super. 206, 211–13, 530 A.2d 1362, 1365 (1987)(*en banc* ), *appeal denied,* 517 Pa. 623, 538 A.2d 876 (1988)).

**6.** As discussed *infra,* the opposing view, taken by the dissenting opinion and advocated by ACandS and its *amicus curiae* herein, is that Section H.3.(f) does not at this juncture permit a fully independent application of state law to the pertinent written release to determine setoff, but rather, requires categorization of the specific cause of action or element of damages at issue pursuant to the terms of Section H.3 (i.e., as in the nature of *pro tanto, pro rata,* allocation or apportionment, or several liability), and application of the setoff rules provided under the pertinent Section H.3 category.

**7.** Also discussed *infra* is the opposing view (taken by ACandS and its *amicus* but not specifically advanced in the Superior Court dissent) that this conclusion overlooks the fact that Section H.3.(c) has the effect of modifying any release given by a plaintiff to the Trust by deeming the plaintiff to have indemnified the Trust against contribution and indemnity claims by codefendants, and that no such modification occurs directly under the terms of Section H.3.(f).

Pa.Super. 369, 625 A.2d 650 (1993), and *Charles v. Giant Eagle*, 513 Pa. 474, 522 A.2d 1 (1987). Judge Schiller determined that these cases did not, as found by the trial court, require that liability of defendants in all strict liability actions be limited to their *pro rata* share of a verdict. *See Baker*, 729 A.2d at 1149 (stating that "[w]e do not read *Walton* or *Ball* so broadly; neither case suggests that joint and several liability should be abolished in strict liability cases"). Nor did he accept ACandS's argument that such authorities require a *pro rata* setoff of a settling tortfeasor's full proportionate share of damages, regardless of the terms of the written release. Rather, Judge Schiller read *Ball* to stand only for the general proposition that, in a strict liability action, the parties' joint and several liability is to be allocated among the joint tortfeasors found liable for the plaintiff's injuries on an equal percentage basis, solely for purposes of applying the UCATA's setoff and contribution provisions. *See Baker*, 729 A.2d at 1150. With regard to *Walton* and *Giant Eagle*, the opinion noted that such cases concern the obligations of a non-settling tortfeasor where the settling tortfeasor paid in excess of its share of allocated liability. *See id.* at 1151 (stating that "[n]either *Walton* nor *Giant Eagle* addressed the issue before this Court, which is the determination of set-off in a strict liability case where the settling defendant paid *less* than its allocated share of liability pursuant to a *pro tanto* release").[8] Thus, the Superior Court majority found that *Walton* and *Giant Eagle* should not be read to compel a court to ignore the terms of a *pro tanto* release in favor of a *pro rata* reduction to the benefit of non-settling tortfeasors in instances in which the amount of consideration provided for the release

---

8. Judge Schiller described the rationale supporting *Walton* and *Giant Eagle* as follows:

In both cases, relying upon policies in favor of promoting settlements, and avoiding a windfall to the non-settling tortfeasor, the Court required the non-settling tortfeasor to pay its full share of allocated liability in spite of the fact that the total payments to the plaintiff exceeded the amount of the jury verdict. The Court reasoned that, "[t]here is no basis for concluding that the jury verdict must serve as a cap on the total recovery that a plaintiff may receive."

*Baker*, 729 A.2d at 1150.

was less than the total verdict. To the contrary, Judge Schiller determined that the terms of Section 8326 of the UCATA should be given effect, and, accordingly, the *pro tanto* setoff in the Baker/Trust release should be honored. *See Baker,* 729 A.2d at 1151. He explained:

> This interpretation serves the policies emphasized in *Walton* and *Giant Eagle* in favor of encouraging settlements and of respecting their finality. This interpretation also furthers the policies reinforced in *Walton* and *Giant Eagle* that the plaintiff should be fully compensated for his injuries, and that a non-settling joint tortfeasor should not benefit from the windfall of a settling tortfeasor paying more than his or her share of allocated liability. By extension, a non-settling joint tortfeasor should not receive a windfall in the form of a release of its joint and several liability to the plaintiff simply because another joint tortfeasor settled for *less* than his or her allocated share of liability. To hold otherwise would be to eradicate the principles of joint and several liability, and effectively to repeal the provisions of the UCATA. Moreover, such a result would discourage settlement because plaintiffs would not have the option of negotiating a *pro tanto* release.

*Baker,* 729 A.2d at 1151.

The Superior Court majority acknowledged that ACandS was not likely to obtain remuneration from the Trust for payments made in excess of its allocated share of the verdict. It found, however, that this resulted as a consequence of the *quid pro quo* established by the Manville settlement and effectuated through the TDP. *See id.* at 1152 (stating that "AC & S was in the class of co-defendants which negotiated for and received valuable concessions in exchange for agreeing not to seek contribution from the Trust; these concessions included being able to treat the Trust as a joint tortfeasor without the introduction of further proof, and receiving a set-off for the Trust's share of liability"). Judge Schiller also viewed the result of enforcing the terms of the *pro rata* release in this case as supported by the established policies of favoring full and fair compensation to injured victims, as well as settle-

ments. *Id.* Thus, the Superior Court reversed, finding that the trial court had erred in failing to enforce the terms of the *pro tanto* release, and remanded, in effect, for the trial court to increase the principal amount of the verdict from $440,000 to $850,000, to account for the balance of the Trust's proportionate share.

Judge Eakin filed a dissenting opinion, joined by President Judge McEwen and Judge Joyce. Like the majority, the dissent discussed the background for and context of the Manville settlement and TDP, emphasizing the binding nature of the TDP upon all Trust beneficiaries, including the parties to the present appeal, and thus, again, the centrality of the TDP to resolution of the setoff issue presented. Judge Eakin also reviewed the pertinent provisions of the TDP, and accepted (at least for purposes of argument) that Pennsylvania may be a state with multiple setoff rules under Section H.3.(f) of the TDP. The dissent concluded, however, that the general categorization for the Commonwealth was of limited significance to the present case, as the relevant inquiry was a determination of the pertinent TDP categorization for a Pennsylvania strict liability action, since the action proceeded on such basis. *See Baker,* 729 A.2d at 1158 (Eakin, J., dissenting) ("accepting the majority's proposition that Pennsylvania is a state with multiple setoff rules does not defeat the more precise proposition that Pennsylvania is a *pro-rata* state for purposes of this strict liability action"). In this regard, Judge Eakin read the *Walton, Ball* and *Giant Eagle* cases as establishing a rule mandating that non-settling defendants be afforded a reduction in the verdict to the extent of the full amount of the *pro rata* share of the verdict attributable to a settling defendant. *See Baker,* 729 A.2d at 1159. With regard to the majority's efforts to distinguish *Walton* and *Giant Eagle* on the basis that those cases involved settlements in amounts that exceeded the ultimate verdict, Judge Eakin stated:

> I see no basis for a rule that *pro rata/pro tanto* allocation depends on the ultimate ratio of settlement to verdict, as the majority's result suggests. Can the applicable princi-

ples of law change with the specific mathematics of the verdict? Does the law apply one standard when settlement exceeds that pro rata share, and another standard when it does not? I find neither logic nor fairness in such a dichotomous approach.

*Baker*, 729 A.2d at 1159.(Eakin, J., dissenting).

Moreover, while acknowledging that "[m]assive litigation spawned this issue, which essentially pits its unique complexity against fundamentals of Pennsylvania law on set-off and contribution," Judge Eakin concluded that "the TDP trumps the Baker/Trust release." *Id.* at 1155, 1159. In this regard, the dissent emphasized that the TDP provides that setoff is the preferred method of satisfying codefendant claims. *See* TDP § H.2.(a). It also concluded that the requirement of a *pro rata* setoff flowed not only from application of principles embodied in this Court's decisional law but also from a direct application of the terms of the TDP; that such application had been determined to be the product of extensive negotiation and a full and fair compromise among the Trust, asbestos health claimants and codefendants; that the settlement assured qualified asbestos health claimants some measure of recovery commensurate with the finite amount of funds available to the Trust; and that the TDP also provided a corresponding measure of protection to codefendants in the form of ensuring a *pro rata* release with respect to the Trust's proportionate share of damages. *See id.* at 1159–60; *see also id.* at 1155 (Eakin, J., dissenting)("[i]n such cases, the *pro rata* approach is preferable because . . . it reflects the reality of the Trust's limited fund status, gives effect to the terms of the TDP, and follows the guidance of cases most relevant to this issue"). The dissent stated:

There is no reason to disregard the hard-fought negotiations of the parties in [*In re Joint Asbestos Litig.*], and the resulting balancing of interests, to give effect to a side agreement between two of the parties, especially where doing so would require a remaining party to pay almost twice the share otherwise required under the TDP and Pennsylvania law.

*Baker*, 729 A.2d at 1160 (Eakin, J., dissenting). Having concluded that, although the Bakers provided the Trust with a *pro tanto* release, such release should be accorded the effect of a *pro rata* one, the dissent expressed its belief that Sections 8326 and 8327 of the UCATA did not require a different result, as it determined that such provisions were not applicable to an action in strict liability. *See id.* Thus, the dissent would have found that the principal amount of the verdict against ACandS should have been limited to $440,000, or ACandS's own proportionate share of the verdict (comprising $410,000 less than the exposure found by the Superior Court majority).

In the present appeal, the arguments presented by the Bakers and ACandS adopt, in large part, or reflect variations upon, the positions articulated by Judges Schiller and Eakin, respectively. Of particular significance to my analysis, however, in their briefs, ACandS and its *amicus curiae*, Owens Corning, also developed a refinement of Judge Eakin's view concerning the consequence of the determination that Pennsylvania is a state with multiple setoff rules. They contend that such classification does not permit a court to proceed directly to an application of state law principles of setoff to the terms of the written release at issue, as the Superior Court majority did (and as does this Court's majority). Rather, ACandS and Owens Corning argue that the direction in Section H.3.(f) that "applicable law shall govern which set-off rules apply to each cause of action or party thereof and each element of damages"

> simply means that the claim must be characterized under the TDP (i.e., *pro rata, pro tanto* or apportionment) according to the law which the state applies to that particular claim. Thus, if (as here) the claim would be subject to a *pro rata* set-off, then that claim falls within the TDP's *pro rata* category for purposes of calculation of the set-off. Again, "applicable law" is merely a directive as to which section of the TDP applies—not an invitation to ignore the TDP altogether.

It bears repeating that the TDP is the negotiated settlement of a **national** class action, in which the parties were forced to group and classify the widely divergent liability/apportionment rules of dozens of different jurisdictions. The TDP was designed to cover, by way of example, states like California, which imposes several liability with respect to economic damages but joint and several liability apportionment with regard to non-economic loss. In such states, a claim is classified under the TDP as several liability for economic claims and joint liability/apportionment for non-economic damages. Likewise, in Pennsylvania, strict liability claims are apportioned on a pro rata basis and such claims are thus classified under the TDP's *"Pro Rata"* category.

Any other conclusion would be absurd. It cannot be seriously contended that where the parties painstakingly negotiated the TDP's set-off provisions, they nonetheless agreed to effectively erase the TDP in states with multiple set-off rules. Yet, this is precisely what the Superior Court majority did, and exactly the reason that this Court must reverse.

Brief of *Amicus Curiae* Owens Corning, at 17–18 (emphasis in original). This argument supports Judge Eakin's view that construction and application of Section H.3.(c) of the TDP is essential to the resolution of this appeal. Based upon the asserted applicability of Section H.3.(c), ACandS offers its central contention that such provision engrafts a *pro rata* release upon any and all settlements with the Trust covered by the provision. *See* Brief of Appellant ACandS, Inc., at 18–19 (stating that "the actual *pro tanto* language in the Baker's (sic) release with the Manville Trust is irrelevant to the set-off for the Manville Trust's share of the verdict because the Bakers are deemed to have given the Manville Trust a release which indemnifies it against cross-claims—that is a *pro rata* release"). Alternatively, ACandS argues that the verdict should be reduced by the *pro tanto* settlement figure, then divided equally among itself and the non-settling tortfeasors with the exception of the Trust.[9]

**9.** This would have the effect of spreading the portion of the verdict currently allocated to the Trust among the remaining settling tortfea-

Upon review of the above expressions and arguments, I would apply the following eleven-part assessment: 1) the parties' respective rights and interests in relation to setoff attributable to the Manville Trust portion of the verdict must be determined first and foremost by reference to the TDP; 2) the TDP requires an initial assessment of state law to determine which of the TDP's five categories (*pro tanto, pro rata,* allocation or apportionment, several liability or multiple setoff rules) applies; 3) pursuant to Section H.3.(f) of the TDP, Pennsylvania is a state with multiple setoff rules; 4) Section H.3.(f), which applies to states with multiple setoff rules, requires that setoff in relation to the Trust's proportionate share of a strict liability verdict be determined pursuant to the specific provision of the TDP that applies to such cause of action (here strict liability); 5) Pennsylvania is a *pro rata* jurisdiction for purposes of a strict liability action under Section H.3.(c) of the TDP; 6) thus, Section H.3.(c) of the TDP, in the first instance, governs the setoff attributable to the Manville Trust in strict liability actions in Pennsylvania; 7) Section H.3.(c) works a modification of any release provided by an asbestos claimant to the Manville Trust; 8) Section H.3.(c) ultimately requires an assessment of how Pennsylvania law would treat a release as modified by the terms of Section H.3.(c); 9) under applicable state law, the release, as modified by Section H.3.(c), does not equate to a *pro rata* release, nor does the cumulative effect of the TDP amount to the functional equivalent of a general surrender by asbestos health claimants of the interest in pursuing full recovery against the Trust's codefendants employing the doctrine of joint and several liability; 10) therefore, ACandS is not entitled to a *pro rata* reduction of the verdict; and 11) in relation to ACandS's alternative argument, Pennsylvania law does not permit the Trust to be removed from the field of joint tortfeasors in allocating shares of liability for purposes of setoff and contri-

sors and ACandS, rendering ACandS liable for its proportionate share plus approximately one-fourth of the current Manville share (a total of $550,000), rather than for both full shares (less only the *pro tanto* settlement figure).

bution. Each phase of this analysis is discussed in greater detail below.

**1) The centrality of the TDP to the resolution of the present appeal** – As noted, both the lead and dissenting Superior Court opinions reflect the contractual nature and scale of the class action settlement undertaking that resulted in the TDP and, correspondingly, the importance of adherence to the negotiated terms. It is undisputed in the present appeal that the TDP governs the parties' respective rights and remedies with regard to any setoff attributable to the Trust's proportionate share of the verdict.

**2–3) The initial TDP category assessment**—The majority chooses not to resolve the parties' dispute concerning whether Pennsylvania falls within the H.3.(f) category (states with multiple setoff rules) or the H.3.(c) category (*pro rata* states). It deems such distinction inconsequential based upon the conclusion that the provisions of Section H.3.(f) are concurrent with those of Section H.3.(c) in compelling the application of state law to determine the pertinent setoff; thus, it is able to disassociate the remainder of its analysis from the TDP and proceed to what it characterizes as the crux of the dispute, namely, whether state law mandates a *pro rata* or *pro tanto* setoff. This assessment, however, overlooks the fact that Section H.3.(c) contains specific rules that engraft additional terms upon any settlement and release (discussed further below) *prior to the ultimate application of state law.* Such rules are not found in Section H.3.(f); therefore, although both sections may ultimately lead to the same result (the application of state law), the terms of the contractual arrangement of rights and interests which must be assessed under applicable law is different depending upon whether Section H.3.(c) applies. Thus, I view the determinations of the proper pathway through the TDP, the applicability of Section H.3.(c), and the effect of Section H.3.(c)'s additional rules as critical to the disposition of this appeal.

With regard to initial TDP categorization, I agree with the Superior Court majority that Pennsylvania should be deemed to be a state with multiple setoff rules under Section H.3.(f) of

the TDP, *see Baker*, 729 A.2d at 1146–47, since our jurisprudence applies differing rules allocating liability among joint tortfeasors in relation to different causes of action and, correspondingly, different setoff rules in connection with the settlement of such causes.

**4) The separate issue of categorization for purposes of a strict liability action**—Although I conclude that Pennsylvania is, in the first instance, a state with multiple setoff rules for purposes of the TDP, I differ with the Superior Court majority's interpretation of Section H.3.(f) as a directive to proceed directly to apply Pennsylvania law to the written *pro tanto* release under consideration. Rather, I would also consider and adopt the portion of ACandS's argument positing that Section H.3.(f)'s directive that "applicable law shall govern which set-off rules apply to each cause of action or party thereof and each element of damages" requires a separate threshold assessment categorizing the segment of state law governing the pertinent cause of action (or element of damages) within the four remaining categories enumerated under Section H.3.(c) of the TDP (*pro tanto, pro rata,* apportionment, or several liability). I believe that this procedure is an appropriate interpretation of the written terms of Section H.3.(f) of the TDP, and effectuates the likely shared intentions of the parties to the TDP and the courts that approved it to provide some degree of standardization in the treatment of similar claims. The approach taken by the Superior Court majority results in the application of different principles governing setoff depending upon whether the jurisdiction treats all forms of tort claims on a *pro rata* basis (in which case Section H.3.(c) of the TDP clearly governs), or only the ones at issue in the case (in which case the Superior Court majority would apply state law without reference to Section H.3.(c)).[10]

10. Also of significance, the provisions of the TDP, as well as the expressions of the courts that approved it, make clear that the document is a Trust-favored one, reflecting an abiding concern for preservation of Trust assets toward maximization of the percentage-based return for present and future Trust beneficiaries. Thus, for example, Section H.3.(c) engrafts the following Trust-favored term upon any release: "regardless of whether the Trust has been given a release, or the wording of any such release, claimants in *pro rata* states shall be

**5–6) Governance of the setoff attributable to the Manville Trust in strict liability actions in Pennsylvania, in the first instance, by Section H.3.(c) of the TDP**—Following from the above, it is next necessary to determine which category under Section H.3 of the TDP applies to a Pennsylvania strict liability action. In this regard, preliminarily, and as further discussed below, for the reasons stated by this Court's majority, I would not adopt the view of the Superior Court dissent that Pennsylvania jurisprudence converts any form of release in a strict liability action into a *pro rata* one. *See Baker*, 729 A.2d at 1159 (Eakin, J., dissenting). Such a conclusion, however, is not a prerequisite to categorizing strict liability actions within the H.3.(c) *pro rata* category. States (and causes of action) falling within the *pro rata* category are those in which "total liability is divided among all defendants found by the fact finder (or agreed by the parties) to be legally responsible tortfeasors including released parties." TDP § H.3.(c). Moreover, it is clear that this definition contemplates only the equal allocation of liability for purposes of contribution (rather than for the ultimate purpose of verdict setoff), as the sentence that follows speaks directly to setoff, specifying that, in *pro rata* states, judgments are reduced, as provided by applicable law, by *either* the released party's *pro rata* share or the *pro tanto* settlement figure. *See* TDP § H.3.(c).[11] As noted by ACandS's *amicus*, such provision of

deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co–Defendants." Under the view espoused by the Superior Court majority, the Trust would not be afforded the benefit of such term in a case such as the present one, since, although Pennsylvania may be a *pro rata* state for purposes of strict liability, the existence of separate rules governing different forms of action not otherwise relevant to Mrs. Baker's claim would eliminate this protection. It would seem unlikely that such result would have been intended.

11. The TDP's employment of an allocation-based definition for *pro rata* states under Section H.3.(c) appears to be inconsistent with the setoff-based definition provided for *pro tanto* and allocation and apportionment states under Sections H.3.(b) and (d). This incongruity is not directly relevant to the present case, but would present complex questions in attempting to categorize a Pennsylvania negligence action under the TDP (facially, Pennsylvania might appear to be an allocation or apportionment state; however, Section H.3.(d) employs a setoff-

the TDP essentially mimics the general rule for apportionment of liability in a strict liability action as stated in the decisional law: "liability is divided proportionately in accordance with the number of joint tortfeasors." *Ball,* 425 Pa.Super. at 386, 625 A.2d at 658. As Pennsylvania law generally provides for a *pro rata* allocation of liability among codefendants and released parties in a strict liability action, *see Baker,* 729 A.2d at 1149–52 (citing cases), I would find that setoff in relation to the Manville Trust portion of a Pennsylvania strict liability verdict is governed by Section H.3.(c) of the TDP.

**7–8) Section H.3.(c) works a modification of the release provided by an asbestos claimant to the Manville Trust** – As previously noted, Section H.3.(c) effectuates the following modification of a release given by a plaintiff to the Trust: "regardless of whether the Trust has been given a release, or the wording of any such release, claimants in *pro rata* states shall be deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co–Defendants." ACandS's arguments equate this language with a *pro rata* release.

While I agree with ACandS that Section H.3.(c) is relevant, I do not agree that it confers the sought-after relief. To so find would render the language of Section H.3.(c) internally inconsistent, since the provision expressly allows for effectuation of a *pro tanto* setoff in states in which the applicable law would permit it. *See* TDP H.3.(c)(i) (providing that the setoff amount may be the Liquidated Trust Payment, i.e., the *pro tanto* settlement figure, where applicable state law so provides). Moreover, under Pennsylvania law, in order for a release to relieve the settling tortfeasor from making contribution to a non-settling defendant, it must provide for a reduction of the verdict against the non-settling tortfeasors to the extent of the settling tortfeasor's *pro rata* share of damages. *See generally* 42 Pa.C.S. § 8327. The provision set forth

based definition of allocation states, requiring that applicable law provide for verdict reduction with reference to the apportioned share of released or absent parties; therefore, Sections 8326 through 8327 of the UCATA would clearly remove Pennsylvania from this category).

above simply does not accomplish this effect, since an agreement to indemnify the Trust in the event that it is required to make payment to codefendants (subject, of course, to the restrictive rules applicable to the assertion of codefendant claims), is, in neither form nor substance, a commitment on the part of asbestos health claimants to accept a diminished verdict from codefendants in the first instance.[12] Where a *pro rata* release is conferred, the settling defendant's immunity from contribution results from the fact that the plaintiff has expressly agreed to surrender his right to pursue the claim against the non-settling defendants. This reasoning, however, does not work in reverse – because a settling codefendant such as the Trust otherwise possesses limited exposure to contribution claims does not mean that the plaintiff has expressly agreed to release the non-settling codefendants from joint and several liability for the full amount of a verdict. Indeed, in such circumstances, the plaintiff possesses a strong incentive *not* to release the non-settling codefendants.[13]

ACandS and Owens Corning suggest that the asbestos defense bar would never have agreed to provide the Trust with the insulation from liability that it receives under the TDP absent the conferral of a *pro rata* release from asbestos health claimants. It is significant, however, that the complained-of exposure is not a consequence of the TDP, but results instead from the application in Pennsylvania of the principle of joint and several liability, which substantially advantages plaintiffs over solvent codefendants in a situation involving one insolvent defendant.[14] The TDP simply does not

12. Significantly, the pertinent provision does not contain "hold harmless and defend" language. Moreover, it is clear that, to the extent that the TDP drafters wished to provide a mandatory *pro rata* credit, they knew how to accomplish this effect. *See, e.g.*, TDP § H.2.(d).

13. ACandS emphasizes the general language of Section H.3 indicating that setoff credit is the preferred method of addressing codefendant claims. This provision, however, does not address the amount of setoff available, which is determined, first by reference to the more specific provisions of the TDP, and ultimately by applicable state law.

14. Indeed, ACandS would have been in precisely the same position had there never been a settlement with Johns–Manville or a TDP—under Pennsylvania law (as interpreted by the majority), Mrs. Baker could

relieve Pennsylvania strict liability codefendants from this effect. In addition to entering the class action settlement with this burden, the Manville codefendants must have appreciated the protections afforded to Johns–Manville under the federal Bankruptcy Code; the finite assets possessed by the Trust created to resolve the flood of asbestos-related claims; their relative position in relation to the asbestos health claimants in terms of priority; and the corresponding likelihood that they would be foreclosed from achieving substantial contribution from Johns–Manville or any entity succeeding to its liabilities. Thus, it is not surprising that they would have compromised their rights against the Trust substantially in furtherance of the Trust's objective to achieve a fair overall distribution and their own desire to attain some degree of contribution and/or setoff in relation to their claims. This appears to be the purpose and effect of the TDP—a balanced division of Trust funds consistent with the existing rights and interests of the parties, with overlaying terms providing additional protection for the Trust corpus. There does not, however, appear to have been an incentive for the asbestos health claimants to effectuate a wholesale restructuring of their core rights and remedies vis-à-vis the Trust's codefendants. Indeed, neither ACandS nor its *amicus* has identified any valuable consideration tendered (or right surrendered) to asbestos health claimants in connection with the class action settlement commensurate with the highly valuable right of the claimants to pursue full recovery under a theory of joint and several liability under applicable law.[15]

    have collected both ACandS and Johns–Manville's portions of the verdict from ACandS, leaving ACandS to look to the insolvent Manville for contribution with little likelihood of substantial recovery.

**15.** ACandS describes the benefit conferred upon asbestos health claimants as enabling them to bring claims against the Trust where previously no recovery would have been possible. In the first instance, this would appear to be an overstatement, since asbestos health claimants had the ability to file claims in the Manville bankruptcy proceeding to pursue some degree of recovery on their claims. Moreover, attainment by the claimants of the agreed-upon ability to pursue a ten-percent return conditioned upon submission to a claims procedure requiring a threshold determination of individual entitlement would not appear to represent a *quid pro quo* for the surrender of an interest as valuable as

9–10) **The application of state law**—As noted, I agree with the majority that, regardless of the continued vitality of *Walton* and *Giant Eagle*, the UCATA applies to strict liability actions. Accordingly, independent of the TDP, Pennsylvania law does not impose a *pro rata* release in the present situation.

11) **ACandS's alternative argument advocating removal of the Trust from the allocation calculation**—As noted by the majority, in *In re Joint Asbestos Litig.*, 919 F.Supp. 1 (E.D.N.Y. & S.D.N.Y.1996), upon assessing the TDP in connection with the application of Maryland law, Judge Weinstein found that judicial modification of the terms of the class settlement was necessary to achieve a balanced result. The selected modification was to lessen the effect of joint and several liability by spreading the bulk of the Trust's proportionate share of liability among the other codefendants' shares. *See id.* at 8–9. Judge Weinstein reasoned that departure from the terms of the TDP and relief from the effect of Maryland law was appropriate, since "the Trust confounds the underlying assumption of Maryland law that a joint tortfeasor can be made to pay a pro rata share, irrespective of whether it pays to the plaintiff or to a co-defendant." *Id.* at 8.

I would defer to Judge Weinstein's assessment of Maryland law, as it is not directly pertinent to this case. As previously

the ability to pursue full recovery against the codefendants (in the present case, the exchange would have been of a chance to obtain $30,000 for the chance to obtain $440,000). This is so particularly since the codefendants attain a corresponding benefit from the claimant's receipt of settlement funds from the Trust in the form of a verdict setoff of at least the *pro tanto* settlement figure. *See, e.g.*, TDP § H.3.(c)(i).

Owens Corning emphasizes that the settlement was on a national scale, therefore suggesting that balancing of rights must be viewed on a broader basis. Owens Corning does not, however, provide any discrete examples of the interests exchanged in this broader field. Moreover, the structure of the TDP retains, in substantial part, the governance of applicable local tort principles, thus seeking to strike its balance of the parties' interests vis-à-vis the Trust within the context of individual claims. Indeed, it would be highly unlikely that a court would approve a settlement that sacrifices substantial interests of claimants in one jurisdiction in favor of the conferral of enhanced entitlements upon claimants within another.

noted, however, in Pennsylvania jurisprudence, the impact to which he refers results, not from the terms of the TDP, but from an ordinary application of the doctrine of joint and several liability, as the same confounding effect is presented by a settling codefendant who becomes insolvent or insulates his assets from judgment. The policy of favoring the injured plaintiff in such circumstances is the very reason that joint and several liability exists and is reflected in the provisions of the UCATA delineating the contribution interests of joint tortfeasors. Thus, I view ACandS's alternative argument not as implicating any failing on the part of TDP, but as an attempt to engraft new terms upon the TDP to correct perceived unfairness that arises wholly independently. While I recognize the substantial difficulties facing Trust codefendants in complex mass asbestos tort litigation,[16] and the arguments among courts and commentators concerning the overall fairness of the application of joint and several liability generally and in such circumstances,[17] this case was not argued or taken to evaluate a widescale restructuring of our tort law as it applies to mass tort cases, but rather, to ensure that the parties' class action settlement was implemented according to its terms.

In summary, in conformance with the majority's holding concerning the effect of Pennsylvania law in relation to written releases, ACandS could obtain a full setoff in relation to the Trust's share of the verdict only if the release provided by the Bakers, or the provisions of the TDP, contained an express agreement to surrender the interest in pursuing full recovery from the Trust's codefendants pursuant to the doctrine of joint and several liability, thereby constituting a full *pro rata* release. The release that the Bakers provided was *pro tanto*, and, although the terms of the TDP insulate the Trust from

**16.** Certainly few of the Manville codefendants contributed to the overall injury to the plaintiffs' class on the scale of Johns–Manville, which was the United States' largest supplier of asbestos-related products.

**17.** *See, e.g.,* Jean Macchiaroli Eggen, *Understanding State Contribution Laws and Their Effect on the Settlement of Mass Tort Actions,* 73 TEX. L. REV. 1701, 1717–21 (June1995). Certainly the burdens of joint and several liability are magnified in the context of mass tort litigation.

substantial exposure to a contribution claim by ACandS, they simply do not reflect a commitment on the part of the Bakers to surrender their interest in pursuing full recovery against the Trust's codefendants, including ACandS. Thus it is that I come to join Mr. Justice Cappy in affirming the order of the Superior Court.

Justice ZAPPALA and Justice NEWMAN join this concurring opinion.